IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MOLLIE PIRON, STEPHANIE MERINO, BOUNSOU THAMVANTHONGKHAM and CHRISTINA BEECROFT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC.,<br><br>Defendant. | CASE NO. 3:19-cv-00709 |

## SECONDED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.

Plaintiffs Mollie Piron, Stephanie Merino, Bounsou Thamvanthongkham and Christina Beecroft ("Plaintiffs") allege on behalf of themselves and a class of similarly situated former employees of Defendant, by way of their Second Amended Class Action Complaint against General Dynamics Information Technology, Inc. ("Defendant" or "GDIT"), as follows:

### NATURE OF THE ACTION

In the spring of 2018, GDIT acquired CSRA, a company which performed federal agency employee background investigations for the OPM. The CSRA employees continued to work within GDIT on the OPM contract as the Civil and Homeland Security Group (the "Group"). These employees included about 1,200 Background Investigators ("Investigators") and Field Supervisors ("Supervisors"), and about 300 Case Reviewers ("Reviewers" or

"Analysts"), including their managers.  These employees did not work at any site owned, occupied or controlled by GDIT. They ultimately reported up to managers Rebecca Knock and Anthony Durante in the Group's Program Management Office in Falls Church, Virginia.

1.     Upon information and belief, in the spring of 2019, GDIT management determined the OPM work would end in September 2019,  and began laying off Group employees.

2.     The first large wave of laid off employees were sent layoff letters on or about June 19 stating they would be terminated on July 3, 2019, because of a "business decision to reduce headcount".

3.     Waves of similar layoffs occurred with termination dates in late-July and August.

4.     The final waves received letters on August 22 and 26 stating that "CSRA made a business decision to end the OPM contract, and that employment would end". Their termination dates were September 5 or 13, 2019, respectively.

5.     Upon information and belief, after September 13, 2019, all Investigators, Supervisors, Reviewers and their district and regional managers were gone, and only a few personnel associated with the Group remained to wrap up its affairs.

6.     Under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 et seq. (the "WARN Act" or "WARN"), an employer must provide 60 days' notice prior to terminating 500 or more employees in a mass layoff, or before terminating 50 or more employees in a plant closing.  The Group employees terminated in the waves of layoffs leading to the shutdown of the Group constituted mass layoffs and a plant closing without 60 days' notice, in violation of the WARN Act.

7.     Plaintiff and all similarly situated employees seek to recover up to 60 days

wages and benefits, pursuant to the WARN Act, from Defendant.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

9.      Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

10.     Plaintiff Mollie Piron was employed by General Dynamics Information Technology, Inc. as a Quality Analyst Associate performing case reviews and worked remotely for Defendant in North Dakota until her termination on or about July 3, 2019.

11.     Plaintiff Stephanie Merino was employed as a Background Investigator III by Defendant and worked remotely in Virginia until her termination on or about September 5, 2019.

12.     Plaintiff Bounsou Thamvanthongkham was employed as a Field Supervisor ("Supervisor") by Defendant and worked remotely in Virginia until his termination on or about July 3, 2019.

13.     Plaintiff Christina Beecroft was employed as a Background Investigator IV/Mentor and worked remotely in Virginia until on or about August 7, 2019.

### *Defendant*

14.     Defendant General Dynamics Information Technology, Inc., is a Virginia corporation with its corporate headquarters located at 3170 Fairview Park Drive, Falls Church, Virginia (the "Facility") and conducted business in this district.

15.     Until their termination in the summer of 2019, Plaintiffs and all similarly situated employees were employed by GDIT and received assignments from, and reported to, the Facility.

16.     Upon information and belief, GDIT made the decision to terminate the employment of Plaintiffs and the other similarly situated employees between July 3 and September 13, 2019 in mass layoffs and a plant closing.

## SUBSTATIVE ALLEGATIONS

17.     GDIT's business was to perform OPM background investigations of applicants for employment or promotion in the federal government.

18.     GDIT would receive OPM requests for full-field background investigations and assign them to its Background Investigators ("Investigators").

19.     The purpose of the full-field investigations was to develop necessary facts that agencies would use in determining the applicant's fitness and suitability for a certain job and for security purposes.

20.     The Investigator had to develop the necessary facts to resolve all material concerns in a case, and establish the background, reputation, character, suitability, or qualifications of the subject under investigation.

21.     The job required Investigators to conduct comprehensive, in-depth interviews with key executives at all levels of government, private industry, and academia.

22.     Investigators had to review appropriate records to develop the necessary facts,

23.     Investigators had to follow policies, procedures and instructions contained in the Investigator's Handbook.

24.     The job required Investigators to travel, usually by car, to each interview and

record review.

25.     All interviews had to be conducted face-to-face.

26.     All records had to be reviewed at their locations, with very few exceptions.

27.     The job consisted of going to appointments, to conduct interviews or reviews, which often could be completed in one day of traveling.

28.     Sometimes they required multi-day trips, and GDIT required that Investigators be available for travel overnight away from their homes up to 100 miles 25% of their time, according to the job description

29.     GDIT's overnight-stay travel requirement was clearly delineated as a task-specific qualification for the position of Background Investigator.

30.     The other standards were generalized, pertaining to basic background, education and skills: namely, U.S. citizenship, an ability to obtain security clearance, a B.S. degree in a variety of subjects or related fields, or the equivalent experience, and "ability to communicate effectively verbally and in writing; to balance and prioritize workloads, and understand and properly interpret policies and procedures regarding federal background investigations."

31.     To fully develop the necessary facts, GDIT charged Investigators with the "principal responsibility" of obtaining, what it called, "sufficient coverage."

32.     It was up to Investigators to determine the number of witnesses to be interviewed, select them, and determine the approach and line of questioning for each.

33.     The Investigators were responsible for exploring the most significant or promising leads; and they were responsible for noting all pertinent facts and records.

34.     OPM guidelines required Investigators to research information, such as the

residential, employment, educational, and criminal histories of individuals subject to background investigations.

35.     All investigative actions had to completed and be fully documented,

36.     The Investigator compiled all the pertinent facts in a report of investigation ("ROI") generated from the interviews and record reviews.

37.     The OPM typically accepted or rejected the ROI based on three criteria: the number of interviews related in the report (quantitative), the quality of the information (qualitative), the timeliness of the delivery of the report (given investigations had to completed on a high priority schedule).

38.     GDIT sought to ensure that its investigation reports contained the greatest number of interviews and records of the highest quality, as quickly as possible.

39.     To achieve this, GDIT required that Investigators do their utmost to visit and gather facts from the maximum number of sources in the field.

40.     To maximize productivity, GDIT divided its fieldwork personnel into four details: Investigators, Supervisors, Case Reviewers, and Mentors (cumulatively, the "fieldwork staff").

41.     Investigators such Plaintiffs Merino and Beecroft, who were Level III and IV Investigators, respectively, carried out the investigations.  They also did mentoring.

42.     Investigators were divided into teams each headed by a Supervisor, such as Plaintiff Thamvanthongkham. Supervisors supported and evaluated Investigators, and they were the first line for answering their questions.

43.     To assure quality, ROIs were vetted by Case Reviewers, such as Plaintiff Piron. When necessary, the Case Reviewer would "reopen" the case with a note to the Investigator

indicating flaws that usually required more interviews or documentation.

44.    If management determined that an Investigator would benefit from remedial on-the-job training or assistance in handling reopened cases, they would assign him or her a Mentor, usually a senior Investigator (such as Plaintiffs Merino and Beecroft).

45.    All fieldwork staff received their assignments from GDIT headquarters, and they submitted their work to GDIT headquarters remotely online.

46.    GDIT gave all fieldwork staff laptops and mobile smartphone devices to do their jobs.

47.    To ensure and encourage optimal performance, GDIT used a point system for evaluating performance and determining advancement and compensation.

48.    Investigators were measured by the number of source "points" contained in their ROIs.

49.    Investigators accrued points for each interview and record review they conducted.

50.    The Investigator earned four points for each subject interview, two points for each source witness interview - one point for other social reference interviews, and one-half point for each record review.

51.    GDIT required Investigators to meet a daily quota of points depending on their level. Level I Investigators had to tally at least three points per day, and Level IV Investigators needed at least six points per day.

52.    Some cases required Investigators to travel within only a 30-mile radius from where they lived to their investigatory appointments, but some cases required further travel.

53.    When appointments required greater travel, Supervisors could increase the

number of source points Investigators earned for those trips.

54.    Investigators received monthly reports cards indicating their accrued source points.

55.    At times, GDIT offered bonuses to Investigators who exceeded their minimum number of source points, in order to reward them for their numerous treks to sources.

56.    Supervisors were evaluated based on the performance of their team of Investigators, and their ratings dropped when Case Reviewers "reopened" their cases.

57.    Supervisors met regularly with their Investigators to help them satisfy or exceed their point quotas and maintain low reopen rates for their ROIs.

58.    Investigators received their assigned cases from Falls Church headquarters via the internet.

59.    The case materials came from GDIT in two electronic packets on systems used by OPM.  One was the Personnel Investigation Processing System (PIPS), the primary system for the processing, storing and administration of background investigations on applicants for federal government positions.

60.    The other was the Federal Document Repository (FDR) which provided supplementary case documents.

61.    Besides using these systems, GDIT's Investigators would transmit their work through the Field Work System (FWS), another OPM system.

62.    Strictures were placed on information transmitted through these security sensitive OPM systems; they could not be transmitted from the laptop to any other device.

63.    Case materials and reports could be viewed by Investigator or Supervisor wherever they went but only on their own laptops and devices.

64.     The electronic case documents could be printed out, however, and taken to appointments.

65.     When not in use, printed-out documents had to be stored for privacy purposes in a designated area secured by two locks; typically, the first lock was on an exterior (or inner room) door, and the second lock was on a safe, cabinet, or drawer within.

66.     GDIT permitted work to be done anywhere, including public venues such as coffee shops or restaurants.

67.     The only requirement was that when working in public areas, GDIT fieldwork staff had use GDIT's mobile devices to access the internet, and not public Wi-Fi systems.

68.     The mobile device would access a telecommunications service, such as Verizon, for which GDIT would defray the expense.

69.     The smartphone would serve as a Wi-Fi hotspot, through which the laptop would connect to the internet as well.

70.     Upon information and belief, all field staff used these two devices to connect to GDIT in doing their jobs.

71.     The mobile phone and laptops allowed fieldwork staff to do their jobs wherever they liked or had to be.

72.     GDIT did not require field staff to have a landline telephone or internet service in their homes or elsewhere.

73.     GDIT did not provide Investigators and Supervisors allowances or expense reimbursements for any work they performed at home.

74.     Other than their laptops and mobile devices, GDIT did not provide field staff equipment to do their work, although some Investigators carried physical appointment books,

and Case Reviewers were provided a printer.

75.     When the Investigators received their cases, they identified the witnesses to interview and records to review.

76.     Investigators then made appointments to conduct these interviews and reviews.

77.     Each interview and review required an excursion because Investigators could not conduct them at their homes or by electronic means.

78.     All interviews of subjects and other sources were conducted where the interviewee worked or at a neutral site, such as a library meeting room.

79.     Interviews of some witness could take less than an hour while those of subjects could last as long as seven hours.

80.     All records also had to be reviewed *in situ* except for a limited number of OPM-approved basic online data.

81.     From around the country, GDIT brought new-hired, inexperienced Investigators to a hotel near its Falls Church, headquarters to attend orientation and training.

82.     Trainers led the week or so of classroom sessions, then Mentors conducted on-the-job training, also in the Falls Church-area.

83.     On-the-job training consisted of Mentors and Investigator-trainees going out on investigations, and together interviewing sources and reviewing records to demonstrate how to do the job.

84.     Typically, Investigators had to complete each assigned case within 14 days.

85.     Supervisors assisted Investigators in setting up and trouble-shooting problems that arose during investigations.

86.     Supervisors regularly met with the Investigator to go through all the

Investigator's cases. They would discuss the strategy or plan and what needed to be done in each case.

87.     Supervisors regularly "shadowed" their Investigators and performed "check rides."

88.     The OPM required that Investigators undergo a "check ride" once a year, in which a Supervisor or Mentor would accompany and evaluate the Investigator's performance of investigations.

89.     When management determined that Investigators would benefit from specialized remedial support, Mentors would assist the Investigator in overcoming the deficiencies.

90.     Mentors also sometimes helped Investigators understand how to correct the flaws Reviewers found when reopening their cases.

91.     Mentors, who were generally Level III or IV Background Investigators, ordinarily had their own caseloads and would fit their mentoring work in between their own investigation appointments.

92.     Mentors travelled to the locations of the Investigator-mentees for meetings, "shadowing," and "check rides," in addition to traveling for their own casework.

93.     When GDIT arranged for Investigators to receive in-service training in group sessions, they gathered at a hotel within a district or region, with Mentors and Supervisors sometimes in attendance, as well.

94.      When Supervisors and Mentors conducted on-the-job meetings or training, Investigators would learn how to better develop leads, plan their investigative trips efficiently, and improve their interviews and reports.

95.     Investigators might be contacted by a Supervisor who was in the area, or they initiated a meeting themselves.

96.     The Supervisor and Investigators would arrange to meet them at a specified location, such as a Starbucks, Panera Bread or library; they did not take place at the homes of either.

97.     Before submitting reports, Investigators at times would ask the Supervisor to go over their work.

98.     Because draft ROIs could not be transmitted under GDIT's privacy protocols, Supervisors would meet with the Investigator and provide feedback and advice, sometimes as the report was being typed.

99.     Typically, Investigators and Supervisors spent at least three-and-a-half-to-four days per week, roughly 70%-80% of their time traveling to their investigation or meeting appointments and performing their assigned work there.

100.    In between these appointments, field personnel could spend time, usually at a coffee shop or similar venue, sending emails or making calls to set up the next days' appointments, typing reports or doing administrative paperwork.

101.    Administrative paperwork included going to the GDIT mileage calculator. The mileage calculator, like all the GDIT systems, was online and thus accessible from the mobile devices and laptops.

102.    Each point of origin and destination of a trip was put in the Mileage Calculator to compute the number of miles traveled for reimbursement purposes.

103.    The total miles travelled was multiplied by the federal mileage reimbursement rate, and GDIT paid that amount each month to the employee.

104.    GDIT only reimbursed gas mileage, hotel and internet connection costs, and no other expenses.

105.    GDIT emphasized that interviews and record reviews took precedence over all other work; unless they were done there would be no reports to type, or anything else to do.

106.    With that understanding, Investigators and Supervisors generally would devote themselves to those tasks first, and only caught up on typing and administrative work at the end of the day, or on one day a week.

107.    GDIT did not require fieldwork staff to dedicate a particular place to do paperwork, but it was often done at home.

108.    GDIT did not list the home addresses of the fieldwork staff as GDIT businesses addresses, such as in telephone books or other directories.

109.    GDIT did require Plaintiffs to represent that GDIT's headquarters was their work address in their email signature blocks, as follows:

> [NAME]
> [JOB TITLE]
> General Dynamics Information Technology
> OPM/BICS/Personnel Vetting & Security
> 3170 Fairview Park Drive
> Falls Church, VA 22042
> [Cell #]
> [Email address – first.last name@gdit.com]
> www.gdit.com

110.    GDIT did not take out insurance on the fieldwork staff's homes or cars, nor did it require that they insure them.

111.    GDIT did not require that fieldwork staff spend any time at a particular location, other than occasional training sessions in hotels.

112.    Virginia-area Supervisors and some Mentors occasionally had to attend

managerial meetings at GDIT's Falls Church headquarters.

113.     When they arrived at headquarters, they gained entry as visitors never having been issued swipe badges or cards for access to GDIT's premises.

114.     Supervisors were typically responsible for a geographic area of 30-miles radius; or in less-concentrated areas, up to 300 miles away.

115.     A supervisor could have up to 30 Investigators to supervise.

116.     The Investigators assigned to the team of Supervisor Thamvanthongkham were located anywhere from Fredericksburg to Blacksburg, Virginia – a distance of over 250 miles.

117.     To meet with his distant team members, Plaintiff Thamvanthongkham had to drive up to eight hours, round-trip, to reach them.

118.     Because these meetings with Investigators required overnight stays, he would plan multi-day trips, staying in hotels, for which he would receive reimbursement.

119.     Due to staffing reductions in 2018-2019, Supervisors' territories were expanded; for example, one Virginia-based Supervisor became responsible for Investigators in Atlanta, Georgia.

120.     Investigators submitted their reports via the FWS to GDIT's servers.

121.     Case Reviewers, including Molly Piron, were assigned case reports to analyze from GDIT headquarters.

122.     The Case Reviewer would open the case packet materials and reports that were on GDIT's servers.

123.     Upon analysis, the Case Reviewer would indicate whether the report needed to be reopened, and, if so, a deficiency note would be included, usually prompting further investigation by the Investigator.

124.    Reports the Case Reviewer approved were delivered by GDIT to the OPM for use and remittance.

125.    At conclusion of the case, the fieldwork staff had to pack up any hard-copies of case-related materials and bring them to a FedEx office for shipment back to GDIT headquarters for shredding.

## WARN CLASS ALLEGATIONS, 29 U.S.C. § 2104

126.    Plaintiffs bring the Claim for Relief for violation of 29 U.S.C. § 2101 *et seq.*, on behalf of themselves and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from one of Defendant's Facility and were terminated without cause beginning on or about July 3, 2019 through September 5, 2019, and within 90 days of those dates, or were terminated without cause as the reasonably foreseeable consequence of the mass layoff and/or plant closing ordered by Defendant beginning on or about July 3, 2019, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

127.    The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendant.

128.    On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendant.

129.    On information and belief, the rate of pay and benefits that were being paid by

Defendant to each WARN Class Member at the time of his/her termination is contained in the books and records of the Defendant.

130.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendant who worked at or reported to Defendant's Facility;

(b)     whether Defendant unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)     whether Defendant unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

131.     Plaintiffs' claims are typical of those of the WARN Class. Plaintiffs, like other WARN Class members, worked at Defendant's Facility and were terminated without cause beginning on or about July 3, 2019 through September 13, 2019 due to the mass layoffs and/or plant closing ordered by Defendant.

132.     Plaintiffs will fairly and adequately protect the interests of the WARN Class.

Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

133.     On or about July 3, 2019 through September 5, 2019, Defendant terminated Plaintiffs' employment as part of mass layoffs or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any

questions affecting only individual members of the WARN Class, and because a class action

superior to other available methods for the fair and efficient adjudication of this litigation –

particularly in the context of WARN Act litigation, where individual plaintiffs may lack the

financial resources to vigorously prosecute a lawsuit in federal court against a corporate

defendant, and damages suffered by individual WARN Class members are small compared to

the expense and burden of individual prosecution of this litigation.

134.     Concentrating all the potential litigation concerning the WARN Act rights of

the members of the Class in this Court will obviate the need for unduly duplicative litigation that

might result in inconsistent judgments, will conserve the judicial resources and the resources

of the parties and is the most efficient means of resolving the WARN Act rights of all the

members of the Class.

135.     Plaintiffs intend to send notice to all members of the WARN Class to the extent

required by Rule 23.

## CLAIM FOR RELIEF

### Violation of the WARN Act, 29 U.S.C. § 2104

136.     Plaintiff realleges and incorporates by reference all allegations in all preceding

paragraphs.

137.     At all relevant times, Defendant employed more than 100 employees who in the

aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the

United States.

138.     At all relevant times, Defendant was an "employer," as that term is defined in

29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a), and continued to operate as a business until

they decided to order a mass layoff or plant closing at the Facility.

139. On or about July 3, 2019 through September 13, 2019, Defendant ordered a mass layoff and/or plant closing at the Facility, as those terms are defined by 29 U.S.C. § 2101(a)(2).

140. The mass layoff or plant closing at the Facility resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendant's employees as well as thirty-three percent (33%) of Defendant's workforce at the Facility, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

141. Plaintiffs and the Class Members were terminated by Defendant without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoff or plant closing ordered by Defendant at the Facility.

142. Defendant's Facility was the "single site of employment" for the Plaintiffs and the Class Members, as that term is defined in 20 C.F.R. § 639.3 (i).

143. Plaintiffs and the Class Members are "affected employees" of Defendant as within the meaning of 29 U.S.C. § 210l(a)(5).

144. Defendant was required by the WARN Act to give the Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

145. Defendant failed to give the Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

146. Plaintiffs and each of the Class Members, are "aggrieved employees" of the Defendant as that term is defined in 29 U.S.C. § 2104 (a)(7).

147. Defendant failed to pay the Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for

60 days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations.

148.     The relief sought in this proceeding is equitable in nature.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, individually and on behalf of all other similarly situated persons, pray for the following relief as against Defendant:

A.     Certification of this action as a class action;

B.     Designation of the Plaintiffs as the Class Representatives;

C.     Appointment of the undersigned attorneys as Class Counsel;

D.     A judgment in favor of the Plaintiffs and the other similarly situated former employees equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other COBRA benefits, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, all determined in accordance with the WARN Act, 29 U.S.C. § 2104 (a)(1)(A);

E.     Attorneys' fees in accordance with, 29 U.S.C. § 2104 (a)(6); and

F.     Such other and further relief as this Court may deem just and proper.

DATED:  April 27, 2020

<u>                    /s/                    </u>
Jennifer J. West (VSB #47522)
Edward E. Bagnell, Jr. (VSB #74647)
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100
jwest@spottsfain.com
ebagnell@spottsfain.com


Jack A. Raisner, Esq. (*pro hac vice*)
René S. Roupinian, Esq. (*pro hac vice*)
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Ste. 1600
New York, NY 10110
Telephone:(212) 221-1747
jar@raisnerroupinian.com
rsr@raisnerroupinian.com
*Attorneys for Plaintiffs and the putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

Neil H. MacBride
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W., Suite 1200
Washington, D.C. 20005
Telephone: (202) 962-7000
E-mail: neil.macbride@davispolk.com

Paul S. Mishkin
Craig J. Bergman
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
E-mail: paul.mishkin@davispolk.com
E-mail: craig.bergman@davispolk.com

*Attorneys for Defendant General Dynamics
Information Technology, Inc.*

_____/s/_____
Edward E. Bagnell, Jr. (VSB No. 74647)
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100
Email: ebagnell@spottsfain.com
*Attorneys for Plaintiffs and the putative class*