**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| MOLLIE PIRON, STEPHANIE MERINO, BOUNSOU THAMVANTHONGKHAM, and CHRISTINA BEECROFT, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., <br><br> Defendant. | CASE NO. 3:19-cv-00709-REP <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION
<u>FOR CLASS CERTIFICATION AND RELATED RELIEF</u>**

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................2

I.     OVERVIEW OF THE WARN ACT ...................................................................2

       A.     WARN Act General Requirements.............................................................2

       B.     Subpart 6 and the Fourth Circuit's "Truly Mobile Worker" Standard ..................4

       C.     Subpart 8 and "Truly Unusual" Organizational Structures.......................5

II.    CASE HISTORY ................................................................................................5

III.   FACTS ...............................................................................................................7

       A.     The OPM Program......................................................................................7

       B.     The Putative Class Representatives ............................................................11

              1.     Mollie Piron ...................................................................................11

              2.     Stephanie Merino ...........................................................................12

              3.     Bounsou Thamvanthongkham .......................................................14

              4.     Christina Beecroft ..........................................................................16

ARGUMENT ................................................................................................................18

I.     CLASS CERTIFICATION STANDARDS..........................................................18

II.    PREDOMINANCE IS LACKING BECAUSE SUBPART 6 CANNOT ESTABLISH
       ANY SINGLE SITE OF EMPLOYMENT ON A CLASSWIDE BASIS .......................20

       A.     Predominance Standard .............................................................................20

       B.     "True Mobility" Cannot Be Shown on a Classwide Basis ...................22

              1.     The *Meson* Test Is Holistic and Circumstance-Dependent.....................22

              2.     The Common Evidence Proffered by Plaintiffs Is Insufficient to Show
                     "True Mobility" ...........................................................................23

              3.     The *Meson* Inquiry Will Demand Individualized Proof ..........................25

i

        4.      Certification Would Deprive GDIT of Its Right to Litigate Its *Meson*-Based Defense Against Individual Class Members ................................27

    C.    Identifying Class Members' Single Sites of Employment Under Subpart 6 Would Raise Still More Individualized Questions ...............................................28

III.    PLAINTIFFS' BELATED REFERENCE TO SUBPART 8 CHANGES NOTHING .....29

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Amchem Prod., Inc. v. Windsor*,
 521 U.S. 591 (1997) ................................................................ 21

*Aronson v. Gannett Publ'g Servs., LLC*,
 No. EDCV19-996, 2020 WL 2891940 (C.D. Cal. May 29, 2020)......................................... 26

*In re Asacol Antitrust Litig.*,
 907 F.3d 42 (1st Cir. 2018) ........................................................ 28

*Austen v. Catterton Partners V, LP*,
 268 F.R.D. 146 (D. Conn. 2010) ................................................... 26

*Bader v. N. Line Layers, Inc.*,
 503 F.3d 813 (9th Cir. 2007) .................................................. 28, 29

*Bell Atl. Corp. v. AT&T Corp.*,
 339 F.3d 294 (5th Cir. 2003) ...................................................... 21

*Branch v. Gov't Emps. Ins. Co.*,
 323 F.R.D. 539 (E.D. Va. 2018) ..........................................18, 20, 21, 26

*In re Circuit City Stores, Inc.*,
 No. 08-35653, 2010 WL 120014 (Bankr. E.D. Va. Jan. 11, 2010) ..................................... 2, 3

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ............................................................ 18, 19

*Davis v. Signal Int'l Tex. GP, L.L.C.*,
 728 F.3d 482 (5th Cir. 2013) ..................................................... 5, 30

*EQT Prod. Co. v. Adair*,
 764 F.3d 347 (4th Cir. 2014) ..........................................18, 19, 21, 26

*In re Family Dollar FLSA Litig.*,
 3:12-CV-1951, 2014 WL 1091356 (W.D.N.C. Mar. 18, 2014) ............................................ 26

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
 254 F.R.D. 68 (E.D.N.C. 2008) .................................................. 24, 25

*Gales v. Winco Foods*,
 No. C09-05813, 2011 WL 3794887 (C.D. Cal. Aug. 26, 2011) ........................................... 24

*Gen. Tel. Co. of Southwest v. Falcon*,
 457 U.S. 147 (1982) .............................................................. 19

iii

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ........................................................ 19, 20, 28

*Harbert v. Healthcare Servs. Grp., Inc.*,
   391 F.3d 1140 (10th Cir. 2004) ........................................................ 23

*Kephart v. Data Sys. Int'l, Inc.*,
   243 F. Supp. 2d 1205 (D. Kan. 2003) ........................................................ 30

*Lienhart v. Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) ........................................................ 25, 26

*Likes v. DHL Exp.*,
   288 F.R.D. 524 (N.D. Ala. 2012) ........................................................ 26

*Lloyd v. Gen. Motors Corp.*,
   266 F.R.D. 98 (D. Md. 2010) ........................................................ 21

*Long v. Dunlop Sports Grp. Americas, Inc.*,
   506 F.3d 299 (4th Cir. 2007) ........................................................ 2

*Manigo v. Time Warner Cable, Inc.*,
   2:16-CV-06722, 2017 WL 5149225 (C.D. Cal. Apr. 4, 2017) ........................... 26

*McLaurin v. Prestage Foods, Inc.*,
   271 F.R.D. 465 (E.D.N.C. 2010) ........................................................ 30

*Meson v. GATX Tech. Servs. Corp.*,
   507 F.3d 803 (4th Cir. 2007) ........................................................ *passim*

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010) ........................................................ 21, 26

*Rangel v. Ensign U.S. Drilling (Cal.) Inc.*,
   1:15-CV-01042, 2017 WL 4310244 (E.D. Cal. Sept. 28, 2017) ...................... 29, 30

*Rifkin v. McDonnel Douglas Corp.*,
   78 F.3d 1277 (8th Cir. 1996) ........................................................ 30

*Schmidt v. FCI Enter. LLC*,
   3 F.4th 95 (4th Cir. 2021) ........................................................ 3

*Schuyler v. Morton's of Chicago, Inc.*,
   CV 10–06762, 2011 WL 13274238 (C.D. Cal. Jun. 13, 2011) ......................... 24

*Seaman v. Duke Univ.*,
   15-CV-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ............................... 21

*Sisney v. Trinidad Drilling, LP*,
   231 F. Supp. 3d 233 (W.D. Tex. 2017) ........................................................ 30

*In re Storehouse, Inc.*,
No. 06-11144-SSM, 2010 WL 4453849 (Bankr. E.D. Va. Nov. 3, 2010) ............... 4, 5, 22, 23

*Teamsters Local Union 413 v. Driver's, Inc.*,
101 F.3d 1107 (6th Cir. 1996) ........................................................................ 3

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006) ...................................................... *passim*

*In re TWL Corp.*,
712 F.3d 886 (5th Cir. 2013) ........................................................................ 19

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .............................................................. 18, 19, 27

*Windham v. Am. Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977) ........................................................................ 27

### Statutes & Rules

29 U.S.C. § 2101 .......................................................................... 3

29 U.S.C. § 2102 .......................................................................... 2

29 U.S.C. § 2104 .......................................................................... 2

29 U.S.C. § 2107 .......................................................................... 3

20 C.F.R. § 639.3 .............................................................. *passim*

Fed. R. Civ. P. 23 .............................................................. *passim*

### Other Authorities

1 McLaughlin on Class Actions (18th ed. 2021) .................................. 19, 21

2 Newberg on Class Actions (5th ed. 2021) ........................................ 20

Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042
(Apr. 20, 1989) .............................................................. 3, 5

H.R. Rep. No. 100-576 (1988).......................................................... 3

Defendant General Dynamics Information Technology, Inc. ("GDIT" or the "Company") respectfully submits this memorandum of law in opposition to the Motion for Class Certification and Related Relief (Dkt. Nos. 61, 65-66) (the "Motion") of Plaintiffs Mollie Piron, Stephanie Merino, Bounsou Thamvanthongkham, and Christina Beecroft (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs' motion for class certification should be denied because no member of the putative class—let alone all of them—could ever establish entitlement to relief without resort to highly individualized evidence.  Plaintiffs are former employees of GDIT who worked on the OPM Program (a contract held by GDIT's affiliate, CSRA LLC, to perform employee background checks for the United States Office of Personnel Management).  The WARN Act claims at issue depend entirely on whether any members of the putative class—who worked from individual home offices scattered across the country from New York to Hawaii—can claim GDIT's corporate offices in Falls Church, Virginia as their "single site of employment."  Under binding Fourth Circuit law, that showing can only be made by employees who are "truly mobile workers."  The "truly mobile" standard is holistic: evidence of work-related travel standing alone is legally insufficient—indeed, even job duties requiring "*significant* travel" do not necessarily qualify.  Instead, courts must examine whether the employee in question lacked a "regular, fixed place of work" for use when not on the road, whether the employee's job was fundamentally "characterized" by mobility, and whether assigning the employee to a particular "single site of employment" would serve the WARN Act's central purpose of protecting geographic communities from large-scale economic disruption.

On these fronts, the putative class members are—at best—all over the proverbial map. Some, including lead Plaintiff Piron (a North Dakota resident), almost never travelled and rarely,

if ever, worked outside of their Company-recognized, Company-equipped home office locations. Others may have engaged in at least somewhat more regular (though still overwhelmingly local) travel, while still maintaining fixed home office setups from which they concededly performed some amount of work as much as four to five days per week.  Some unknown number may have chosen to work, to varying degrees, from public locations (such as cafes) rather than from home offices—a discretionary practice that all four Plaintiffs conceded at deposition differed significantly across class members, would not be reflected in any centralized records, and would require individual inquiries of former employees to document.  Plaintiffs could never make the necessary showings on these issues without the sort of individualized fact-finding or "mini-trials" (almost a thousand or more) that Rule 23's predominance requirement forbids.  Class certification in this case is unworkable and impermissible.

## BACKGROUND

I.   **OVERVIEW OF THE WARN ACT**

    A.   **WARN Act General Requirements**

The WARN Act was enacted "to provide notice of sudden, significant employment loss so that workers could seek alternative employment and their communities could prepare for the economic disruption of a mass layoff."  *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007).[1]  It requires that covered employers provide 60 days' advance written notice to affected employees of a "plant closing" or "mass layoff," and establishes a private cause of action for unpaid wages and benefits in the event of a violation.  *Id.*; *Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 301 (4th Cir. 2007); 29 U.S.C. §§ 2102(a), 2104(a).  The existence of a "plant closing" or "mass layoff" is an affirmative element of any such claim.  *In re Circuit*

---

[1] Unless otherwise noted, all case citations omit internal quotation marks, citations, emphases, and/or alterations.

*City Stores, Inc.*, No. 08-35653, 2010 WL 120014, at *2 (Bankr. E.D. Va. Jan. 11, 2010). Critically, to qualify as a "plant closing" or "mass layoff," an employment loss event must affect at least 50 employees at a "single site of employment."  29 U.S.C. § 2101(a)(2)-(3).  "[A]n employee who had a fixed workplace where fewer than fifty individuals suffered an employment loss" is thus generally "outside of the protections of the WARN Act."  *Meson*, 507 F.3d at 808.

"The WARN Act itself does not define 'single site of employment.'"  *Id*.  But applicable Department of Labor ("DOL") regulations (*see* 29 U.S.C. § 2107; *Schmidt v. FCI Enter. LLC*, 3 F.4th 95, 101 (4th Cir. 2021)) provide that "[a] single site of employment can refer to either a single location or a group of contiguous locations," with the caveat that "[s]eparate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment" (20 C.F.R. § 639.3(i)(1),(3)).  The "plain language" of this regulation "makes clear that geographic proximity provides the touchstone in determining what constitutes a 'single site'" and that "geographically separate facilities are generally separate sites."  *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996); *see also* Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042, 16049 (Apr. 20, 1989) ("DOL Commentary") ("As a general rule, a geographic connection or proximity is required to define 'single site of employment.'"); H.R. Rep. No. 100-576, at 1046 (1988) ("geographically separated operations are not to be combined").  This emphasis on geographic proximity is grounded in the WARN Act's key purpose of allowing "*communities* [to] prepare for the economic disruption of a mass layoff."  *Meson*, 507 F.3d at 808 (emphasis added); *Driver's, Inc.*, 101 F.3d at 1109 ("Where the workers are geographically separated . . . the impact on the community is reduced.").

3

### B.      Subpart 6 and the Fourth Circuit's "Truly Mobile Worker" Standard

In seeking to claim GDIT's corporate offices in Falls Church (the "Falls Church Office")

as their "single site of employment," Plaintiffs invoke an exception to the general "separate

facilities" rule.  (Second Amended Class Action Complaint (Dkt. No. 39) ("SAC") ¶¶ 0,[2] 15, 45,

58, 126; Plaintiffs' Memorandum in Support of Motion (Dkt. Nos. 65-66) ("Opening Brief" or

"Br.") at 24-27.)  That exception is set out in 20 C.F.R. 639.3(i)(6) ("Subpart 6"):

> For workers whose primary duties require travel from point to
> point, who are outstationed, or whose primary duties involve work
> outside any of the employer's regular employment sites (e.g.,
> railroad workers, bus drivers, salespersons), the single site of
> employment to which they are assigned as their home base, from
> which their work is assigned, or to which they report will be the
> single site in which they are covered for WARN purposes.

In *Meson*, the Fourth Circuit construed Subpart 6 narrowly, holding that it "was intended

to apply *only* to *truly mobile workers without a regular, fixed place of work*."  507 F.3d at 809-

11 (emphasis added).  It deemed the provision therefore unavailable to employees with a "fixed

workplace or office," even if they purportedly "report[] to" some remote corporate headquarters.

*Id.* at 804, 808-10.  It further made clear that even duties requiring "significant travel" do not,

without more, transform an employee into a "truly mobile worker" when that individual also

maintains a "fixed workplace" for use when *not* traveling.  *Id.* at 804, 809-11.  Finally, the

*Meson* court emphasized that geography remains a significant consideration, explaining that

"minimal impact" on a plaintiff's community "militates against" applying Subpart 6.  *Id.* at 811.

Following *Meson*, courts in this Circuit have rejected attempts by plaintiffs to claim

remote corporate facilities as their single site of employment on the basis of mere travel or of

purported flexibility to work from anywhere.  In *In re Storehouse, Inc.*, for example, the court

---

[2] GDIT refers to the first substantive paragraph of the SAC, which is not enumerated, as Paragraph "0."

concluded that a logistics manager who "spent much of his time traveling" could not claim a company headquarters hundreds of miles away as his single site even though he "reported to" an executive at that location.  No. 06-11144-SSM, 2010 WL 4453849, at *1, 3-4 (Bankr. E.D. Va. Nov. 3, 2010).  Rejecting plaintiff's claim to be essentially a roving, "officeless" worker, the court determined that he in fact maintained a "fixed workspace," either at a local retail location or at his own home, to which he "consistently reported" whenever "not on the road."  *Id.* at *1, 3-4 (plaintiff's "residence in Richmond would have been his single site of employment, since it would have been his fixed workspace when he was not traveling for work").

### C.  Subpart 8 and "Truly Unusual" Organizational Structures

In the Opening Brief, Plaintiffs also invoke—for the first time in this case—another exception to the general single-site-of-employment rules, 20 C.F.R. § 639.3(i)(8) ("Subpart 8"):

> The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply.  The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

Subpart 8 was intended to help the DOL "maintain some flexibility in the definition of 'single site of employment'" in providing for "truly unusual organizational situations which DOL could not anticipate."  DOL Commentary at 16050.  It was explicitly *not*, however, meant to undermine congressional "concern[s]" that "geographically separate facilities be treated separately" and "individual plants . . . individually."  *Id.*; *Davis v. Signal Int'l Tex. GP, L.L.C.*, 728 F.3d 482, 488 (5th Cir. 2013) ("geographic proximity is important" in context of Subpart 8).

## II.  CASE HISTORY

Plaintiffs' first two complaints asserted that the putative class members "all worked from their homes" and did not suggest that they were in any way "mobile workers."  (Dkt. No. 1 ¶¶ 1, 10-11; Dkt. No 5 ¶¶ 1, 10-12.)  Instead, Plaintiffs sought to invoke Subpart 6 and identify the

Falls Church Office as their single site of employment purely because they allegedly "ultimately reported" to managers at that location.  (*See, e.g.*, Dkt. No. 5 ¶¶ 1, 13-14, 16, 29.)

GDIT moved to dismiss, arguing that Plaintiffs' failure to allege "truly mobile worker" status rendered Subpart 6 unavailable under *Meson*.  (*See, e.g.*, Dkt. No. 21 at 7-12.)  In opposition and then again at oral argument, Plaintiffs repeatedly reaffirmed that they "worked from their homes" but claimed coverage under Subpart 6 as "remote" employees working outside of any GDIT-run facility.  (Dkt. No. 24 at 1-2, 4-7, 9, 11-13; Dkt. No. 36 at 22:12-23:7, 24:19-22, 28:7-30:4, 41:11-20, 43:9-18 (Plaintiffs "work[ed] from home" and "by working at home, [were] working outside of the employer's regular employment sites").)[3]

On March 10, 2020, the Court granted GDIT's motion.  (*See* Dkt. No. 37 ("First MTD Opinion").)  The Court rejected Plaintiffs' suggestion that they fell within Subpart 6 by virtue of purportedly "'work[ing] remotely'" (*i.e.*, outside of any GDIT-owned location) and concluded that the availability of Subpart 6 "depends on whether the Plaintiffs can be considered 'mobile' within the meaning of *Meson*."  (First MTD Opinion at 9-11 ("viable WARN Act complaints in this Circuit must meet *Meson*'s standard").)  The Court then deemed Plaintiffs' allegations of "'work[ing] remotely'" and/or "from their homes" insufficient to plead mobility.  (*Id.* at 2, 6-11.)

Plaintiffs filed the now-operative Second Amended Complaint on April 27, 2020.  (Dkt. No. 39 ("SAC").)  The SAC did not disavow Plaintiffs' earlier allegations—or repeated representations to the Court—that Plaintiffs worked from their homes.  To the contrary, it confirmed that Plaintiffs and putative class members "often" completed certain professional tasks "at home."  (SAC ¶ 107.)  The SAC also alleged for the first time that certain types of

---

[3] Plaintiffs' counsel also conceded at argument, in response to questioning by the Court, that Plaintiffs "did not cite or rely on" Subpart 8 in bringing their lawsuit or opposing dismissal but indicated that they might consider "amending the complaint" to do so if given the opportunity.  (*Id.* at 35:13-36:7, 44:18-45:22.)  As discussed further below, Plaintiffs ultimately declined to make any such amendment.  (*See infra* 7, 29-30.)

positions within the OPM Program generally required some amount of "travel" for such purposes as conducting interviews or record reviews, attending meetings, and performing mentoring or supervisory activities.  (*See, e.g., id.* ¶¶ 24-29, 52-53, 77-80, 87-88, 92-93, 95-96, 99, 112, 114-15.)  The SAC also newly claimed that GDIT generally "permitted work to be done anywhere," including at public venues such as "coffee shops."  (*See, e.g.*, *id.* ¶¶ 66-67, 71, 100, 111.)  Notably, the SAC again expressly invoked the requirements of Subpart 6—alleging, for example, that putative class members "received assignments from" and "reported to" the Falls Church Office (*see, e.g.*, *id.* ¶¶ 0, 15, 45 126)—but did not purport to rely on Subpart 8, whether by alleging that GDIT was "truly unusual" or otherwise.  The Court sustained the SAC, ruling that its allegations could support an inference that Plaintiffs "fit within the so-called 'mobile worker' category" set out in *Meson* but also recognizing that "further development of the record" could "necessitate a different conclusion" following discovery.  (Dkt. No. 50 at 1-2.)

The parties completed more than two months of class certification discovery, including production of over 40,000 pages of documents, interrogatories, and depositions.  (Dkt. Nos. 51, 54.)  Plaintiffs' Motion seeks certification of a class of "[t]he GDIT employees who worked on its OPM contract and were terminated between July and December 2019" (Br. at 17) and propose a "case management subclass," as necessary, of those who served as "Background Investigator, Project/Task Supervisor or similarly situated positions" (*id.* at 17-18) (the "Proposed Classes").

## III.   FACTS

### A.   The OPM Program

Plaintiffs in this case are two background investigators, a case reviewer, and a field supervisor formerly employed to work in the OPM Program, which concluded in late 2019.  All, or substantially all, of the employees who held these positions worked out of "home office[s]" in "geographically dispersed" locations all across the U.S. as part of a "regional structure"

organized to meet OPM needs.  (*See, e.g.*, Pls. Ex. 8[4] (GDIT personnel records listing employees' locations as "home office"); Pls. Ex. 6 at GDIT-000031544, 31549, 31551, 31553, 31556, 31570, 31589, 31612, 31666-76; *see also* Pls. Ex. 1 ("Shartle Dep.") 185:19-186:1 (OPM Program "provided coverage across 44 states").)  Plaintiffs' jobs were advertised as "100% remote work from home" positions.  (Pls. Ex. 39 at GDIT-000040584; *see also* Ex. 1 (exemplar background investigator job posting listing "primary location" as "home office").)  Upon hire, GDIT policy categorized these employees as "Home-based Worker[s]."  (Pls. Ex. 25 at GDIT-000042986-88 (discussing employees' "home workspaces"); Shartle Dep. 101:19-103:16, 106:2-21.)  Throughout the OPM Program, GDIT was required to remit monthly reports reflecting employees' individual addresses as their "assigned duty station[s]."  (Ex. 2 (Excerpts of October 1, 2018 Modification of OPM NBIB Fieldwork Services Contract ("OPM Contract")) at GDIT-000043042.)  And GDIT's communicated expectation was that OPM Program employees "were to work from their home[s]" when not conducting fieldwork.  (Shartle Dep. 104:15-105:6, 126:2-127:9, 127:24-128:23, 130:18-131:21, 134:4-21, 192:19-193:20.)

To that end, GDIT provided OPM Program employees with (or reimbursed them for) a variety of work-from-home equipment, including laptops, docking bays, printers, monitors, and office supplies.[5]  It also required employees to maintain locking file cabinets (or other similar "barriers") in their personal residences for the safe storage of investigation case materials containing personally identifiable information ("PII").  (Pls. Ex. 26 at GDIT-000029534, Pls. Ex. 27 at P061; Pls. Ex. 3 ("Merino Dep.") 54:16-55:4; Pls. Ex. 6 at GDIT-000031556, 31559.)

---

[4] Citations in the form "Pls. Ex. __" are to the exhibits to Plaintiffs' Opening Brief.  Citations in the form "Ex. __" are to exhibits to the Declaration of Paul S. Mishkin in Support of GDIT's Opposition to Plaintiffs' Motion ("Mishkin Dec."), which is being filed concurrently herewith.

[5] (Pls. Ex. 6 at GDIT-000031589-90; Pls. Ex. 16 ("Merino Rog Responses") at 4; Pls. Ex. 17 ("Beecroft Rog Responses") at 4; Pls. Ex. 18 ("Thamvanthongkham Rog Responses") at 4; Pls. Ex. 19 ("Piron Rog Responses") at 4.)

Employees could only print case materials from their "remote home locations."  (Ex. 3 (Excerpts of July 19, 2016 Response to OPM's Technical Questions and Proposal Revisions) at GDIT-000031891.)  And the Company's PII policy, with which employees certified compliance (Pls. Ex. 27; Shartle Dep. 109:10-110:15), "emphasized that only the minimum PII necessary to work productively should be carried into the field" and that "[a]ll personnel should limit the printing and transporting of PII whenever possible" (Pls. Ex 26 at GDIT-000029532, 29534; Shartle Dep. 120:6-12; Pls. Ex. 4 ("Thamvanthongkham Dep.") 125:5-127:14, 136:24-137:11).

GDIT monitored compliance with these at-home storage requirements through "check rides" conducted by senior OPM Program employees, which included visits to individuals' residences.  (Thamvanthongkham Dep. 119:4-120:4; Pls. Ex. 5 ("Beecroft Dep.") 123:16-21; Pls. Ex. 21 at GDIT-000012242 (evaluating familiarity with PII requirements "at home").)  Employees were also required to prepare "daily manifest[s]" documenting the removal of PII from one's home and its return thereto.  (Pls. Ex. 26 at GDIT-000029538; Beecroft Dep 117:18-118:4, 158:5-10; Thamvanthongkham Dep. 73:4-9; Merino Dep. 72:5-73:11, 105:22-106:10, 144:14-145:2; Shartle Dep. 120:13-19; Pls. Ex. 6 at GDIT-000031559, 31566.)

The "primary" purpose of the OPM Program was to produce reports of investigation ("ROIs").  (Shartle Dep. 48:3-7.)  Delivering that product "efficient[ly]" required the Company to "minimize" employee travel time and its associated costs.  (*Id.* 164:23-165:2, 168:19-169:13, 190:5-191:24; Pls. Ex 6 at GDIT-000031567, 31618, 31657.)  GDIT took several steps to do so:

- ***Geographically-Based Hiring and Assignment.***  GDIT hired OPM Program employees by geographic "region[]."  (*Id.* at GDIT 31550-51, 31571-72, 31599; Shartle Dep. 182-5-12, 185:19-186:1, 188:17-189:2.)  It then made case and supervisory assignments according to workers' residential locations—generally, for example, matching investigators with cases in a "30 mile radius based on [their] home location[s]" or zip codes.  (Pls. Ex. 39 at GDIT-000040585; Pls. Ex. 6 at GDIT-000031567, 31609; OPM Contract at GDIT-000043017; Shartle Dep. 181:23-182:3, 182:24-183:4, 185:19-186:1, 187:21-190:2; Merino Dep. 94:2-5.)  Thus, GDIT

"maximize[d] geographic proximity" between employees' homes and their work and "minimize[d]" travel.  (Ex. 4 (Defendant's Responses to Plaintiffs' Second Set of Interrogatories Pertaining to Class Discovery, dated August 23, 2021) at 5; Thamvanthongkham Dep. 63:12-23; Merino Dep. 102:9-22.)

- *Zoning.*  GDIT also trained employees to "zone" their work, which entailed "taking advantage of the geographic proximity of Items from different cases by working on all those Items when in that geographic area." (OPM Contract at GDIT-000043120.; Shartle Dep. 168:2-8, 187:21-191:24.)  This ensured that employees were "not . . . wasting time by driving."  (Thamvanthongkham Dep. 112:22-114:11; Beecroft Dep. 111:23-112:10, 113:8-114:6, 115:2-12; Merino Dep. 93:23-95:8, 105:4-12.)

The extent to which employees in Plaintiffs' positions actually travelled for their work assignments varied dramatically.  Case reviewers generally engaged in "minimal," if any, travel and "had really no reason to leave their homes for their work."  (Shartle Dep. at 192:19-193:20.)  Field supervisors spent "most" of their time in "their home[s]" (*id.* 163:8-15), and the amount that any individual travelled depended on a number of factors, including the size, locations, and seniority of the supervisee group and the extent to which the supervisor chose to delegate administrative tasks (Thamvanthongkham Dep. 197:11-198:4).  There was "significant variation" in the amount that background investigators (who also sometimes performed mentoring activities as discussed further below) spent traveling.  (Shartle Dep. 162:17-163:7, 163:24-164:3.)  Investigators' responsibilities called both for fieldwork involving travel (such as witness interviews and on-site record reviews) and for various other activities that often required no travel (such as reviewing case materials, conducting research, and preparing ROIs).  (Shartle Dep. 134:4-21; Pls. Ex. 39 at GDIT-000040586 (describing "typical day" of an investigator).)  Individual amounts of travel depended on the caseload in an investigator's region, the size and location of the region, the investigator's experience, seniority, and effectiveness in zoning, and supervisor preferences.  (Thamvanthongkham Dep. 198:20-24, 199:15-203:4; Beecroft Dep. 178:18-179:2; Merino Dep. 165:3-20, 208:4-17, 210:7-14; Shartle Dep. 164:13-22.)  Overall,

employees in Plaintiffs' (or substantially similar) positions reported anywhere from *zero* instances of reimbursable travel (approximately 29%, including Ms. Piron) to 400+ instances (<1%), with the vast majority falling somewhere in between.[6]

Investigators received case assignments from "assigners," who, like the investigators themselves, worked out of home offices.  (Shartle Dep. 182:24-183:4, 193:13-20.)  Investigators reported directly to field supervisors, who reported in turn to operations or regional managers, all of whom were likewise home-based.  Case reviewers' direct supervisors also worked from home. (*See infra* 11; Shartle Dep. 60:24-61:4, 148:2-149:10; Pls. Ex. 22 at 000006326 (denoting employees "remote resources"); Pls. Ex. 8 (listing employees' locations as "home office").

### B.    The Putative Class Representatives

#### 1.    <u>Mollie Piron</u>

Ms. Piron worked as a case reviewer (or "quality analyst").  (Pls. Ex. 2. ("Piron Dep.") 31:19-32:21.)  She was responsible for reviewing ROIs prepared by investigators and identifying any deficiencies.  (*Id.* 47:12-48:6, 54:14-57:13, 58:8-60:25.)  Ms. Piron worked from a "home office" in North Dakota.  (Pls. Ex. 8; Piron Dep. 35:2-6, 81:22-82:6.)  She reported to a supervisor who worked out of his own "home office" in Arizona.  (Piron Dep. 65:13-67:4, 71:3-11; Pls. Ex. 22 at GDIT-000005326)  She received assignments through a case dashboard, does not know the source of those assignments, and submitted completed work directly to OPM via the government's Personnel Investigation Processing System or "PIPS."  (Piron Dep. 58:8-19, 67:5-68:10; Pls Ex. 6 at GDIT-000031550; Piron Rog Responses at 6-7.)

During an average workweek, Ms. Piron worked in her home office "five days" out of

---

[6] GDIT has calculated putative class members' reported travel using expense reimbursement request data maintained in the Company's ordinary course of business and produced in discovery.  (*See, e.g.*, Br. at 13; Declaration of Cindy Fullerton in Support of GDIT's Opposition to Plaintiffs' Motion ("Fullerton Dec." or "Fullerton Declaration") ¶¶ 3-4.)  For ease of reference, GDIT's calculations are set out in detail in Appendix A hereto ("Appx. A").

five, reviewing case files and communicating with colleagues. (*Id.* at 3; Piron Dep. 84:7-85:7.) She maintained a variety of work-related equipment in her residence, including a laptop, docking bay, monitor, printer, and file cabinet for PII, all of which she kept on or around a desk in her living room. Several of these items were provided by or paid for by GDIT. (*Id.* at 51:9-12, 85:13-88:17, 89:24-90:6, 91:10-92:17; Piron Rog Responses at 3-4)

Ms. Piron testified that she "could have" worked from locations other than her home but does not recall specific instances of having done so. (Piron Dep. 99:5-18; Piron Rog Responses at 5-6.) And she confirmed that, in actuality, she never left her residence for the purpose of completing work elsewhere and spent only approximately 20-30 minutes per week completing incidental tasks, such as taking a phone call, outside of her home—often or always from her car. (Piron Dep. 73:18-74:6, 95:5-9, 99:5-22, 102:18-22, 103:9-17, 108:24-109:12; *see also* Piron Rog Responses at 6.) Ms. Piron never took case file materials or accessed PIPS outside of her personal residence, and she printed work-related materials exclusively from that location. (Piron Dep. 69:8-16, 90:11-91:4, 96:21-25.) Any decision to handle work tasks outside of Ms. Piron's home was purely a personal decision, and records reflecting the location from which any such work was completed do not exist. (*Id.* 75:7-20, 112:8-113:7, 114:9-115:3.) Other case reviewers may have made different choices about working inside or outside of their residences, but Ms. Piron is unaware of records that would document such individual practices. (*Id.* 115:20-117:13.)

Other than once-per-month car trips to a FedEx location, Ms. Piron engaged in no assignment-specific travel. (Piron Rog Responses at 4-5; Piron Dep. 118:8-119:20.) She never drove more than an hour or travelled overnight for any work purpose. (*Id.* 120:22-121:8.) GDIT's expense records reflect no reimbursable travel recorded by Ms. Piron. (Appx. A.)

###### 2. <u>Stephanie Merino</u>

Ms. Merino worked as a background investigator III and mentor. (Merino Dep. 47:22-

48:19; Pls. Ex. 8.)  She was based in a "home office" in Alexandria (and then Lorton), Virginia

and did not have assigned workspace at any GDIT facility.  (*Id*.; Merino Dep. 221:10-17,

227:13-228:8.)  Ms. Merino's responsibilities included conducting interviews and record

reviews, preparing ROIs, helping to train and conducting check rides with more junior

investigators, and completing administrative tasks and paperwork.  (Merino Dep. 57:17-58:4,

60:20-61:11, 70:4-72:4. 79:21-88:16.)  She covered a geographic region centered around the zip

code of her personal residence.  (*Id.* 200:15-201:20.)  Ms. Merino testified that she reported to

supervisor Brandon Powell, who also "worked from home" and did not have an office at any

GDIT facility.  (*Id.* 58:5-60:9.)

Consistent with her expectations upon hiring, Ms. Merino performed work-related tasks

out of her personal residence on all five days out of an average workweek.  (Merino Dep. 56:8-

23; 152:17-153:4; Merino Rog Responses at 3-4.)  Among other things, she reviewed case

background materials, planned investigations, made scheduling calls, prepared ROIs, and

completed check ride and mentee forms.  (Merino Dep. 56:8-23, 70:3-71:6, 72:2-4, 85:5-10,

161:18-163:10; Merino Rog Responses at 3-4.)  Ms. Merino accordingly maintained work-

related equipment and office supplies in her home, some of which were provided or paid for by

GDIT.  These included a laptop, printer, and filing cabinet for PII, all kept in her "bedroom" or

"dining room" and some of which Ms. Merino used or accessed "every day."  (Merino Dep.

90:7-15, 123:6-10, 166:23-167:14, 168:8-169:24, 171:6-17, 174:21-177:12; Merino Rog

Responses at 4.)  She only printed work materials at home.  (Merino Dep. 88:21-89:23, 162:19-

24, 173:8-14.)

Ms. Merino sometimes travelled to complete specific work assignments, such as

interviews, record reviews, meetings, and mentoring activities, though she does not recall

13

specific instances of travel by date or location.  (*Id.* 196:8-25; Merino Rog Responses at 5-6.)
All of Ms. Merino's travel took place in her personal vehicle and, with one possible exception,
occurred within the vicinity of her personal residence.  (Merino Dep. 198:6-20, 198:24-199:8,
199:22-201:20.)  None of it required an overnight stay.  (*Id.* 201:21-24.)  All told, Ms. Merino
reported reimbursable travel on approximately 50.3% of workdays.  (Appx. A.)

When not traveling for a specific assignment, Ms. Merino sometimes chose to perform
work tasks at locations outside of her personal residence, such as "Panera," the "park," or her
"car," in order to "combat the monotony of working from home."  (Merino Dep. 178:6-19, 181:
12-25.)  She was free to make such decisions entirely on her own and her choices "varied a lot"
depending on the particular circumstances and her own preferences.  (*Id.* 73:18-74:5, 153:12-
154:14, 187:14-188:3, 193:15-194:11; *see also* Merino Rog Responses at 7-8 (practices "varied
greatly" over the course of her tenure).)  Ms. Merino does not recall specific instances of work in
public spaces by location or date and is unaware of any records that would reflect the frequency
with which she worked at any such location or the amount of time she spent doing so.  (Merino
Dep. 75:11-21, 76:16-78:3; 155:11-21, 186:22-187:5; Merino Rog Responses at 7-8.)

Ms. Merino also repeatedly conceded at deposition that other investigators' decisions to
work from public locations were similarly left to their personal discretion, likely "varied" by
employee and over time, and would not be reflected in any documents.  According to Ms.
Merino, there is thus no way to obtain information on these practices without inquiring of
individual investigators.  (Merino Dep. 74:24-75:10, 155:22-156:21, 163:23-164:18, 165:21-
166:22, 184:19-185:13, 187:6-13, 188:4-189:4, 194:6-195:9.)

### 3. **Bounsou Thamvanthongkham**

At the time of his termination, Mr. Thamvanthongkham was a field supervisor in the
OPM Program.  (Thamvanthongkham Dep. 28:8-16.)  In that capacity, he oversaw between

14

approximately 20 and 35 background investigators residing within a region of Virginia that also included his own personal residence in Fredericksburg.  (*Id.* 59:16-61:9, 62:18-63:6, 210:15-23.) He was responsible for guiding and assisting background investigators, monitoring job performance, managing workloads and vacation requests, and conducting check rides.  (*Id.* 71:3-16, 105:15-106:15; Ex. 5 (Org Chart Review presentation, dated June 5, 2019) at GDIT-000000020.)  Mr. Thamvanthongkham "worked from home" and did not have assigned workspace at the Falls Church Office.  (Thamvanthongkham Dep. 50:12-16, 168:19-169:5, 212:8-21, 229:9-231:11.)  He reported, and submitted written work, to an operations manager who also worked remotely.  (*Id.* 138:11-139:16, 141:12-16; Pls. Ex. 22 at GDIT-000005326.)

Mr. Thamvanthongkham performed work tasks from his personal residence on approximately five days out of a given workweek.  (Thamvanthongkham Rog Responses at 3-4; Thamvanthongkham Dep. 80:17-23, 87:2-8, 99:2-9, 101:16-25, 147:23-148:7.)  GDIT furnished or reimbursed Mr. Thamvanthongkham for office equipment and supplies (including a laptop and printer) for the purpose of working in his home, and he maintained his printer in a bedroom, along with a desk and a filing cabinet for PII storage, which he accessed on a "daily basis."  (*Id.* 120:5-121:2, 164:4-165:23, 166:14-16, 174:3-10; Thamvanthongkham Rog Responses at 4.)

Mr. Thamvanthongkham's position required some travel, for which he could seek reimbursement.  (Thamvanthongkham Dep. 181:23-184:20, 195:12-24.)  His travel was primarily for such purposes as conducting check rides and attending trainings or meetings; it all occurred by personal vehicle; and it was entirely within Virginia (with the possible exception of Washington, D.C.).  (*Id.* 184:21-186:22, 187:12-20, 189:12-21, 190:8-11, 191:24-192:23.)  Mr. Thamvanthongkham does not recall specific instances of travel by date or location but estimated that he traveled approximately four to six weeks out of the year in total (or an "average" of

approximately one week per quarter).  (*Id.* 182:4-7, 187:14-189:11, 194:24-195:24; *see also* Thamvanthongkham Rog Responses at 5.)  GDIT records show that Mr. Thamvanthongkham reported reimbursable travel on approximately 13.4% of workdays during his tenure as field supervisor.  (Appx. A.)  Mr. Thamvanthongkham testified that other supervisors' amounts of reimbursable travel would depend on various factors, including the size, location, and seniority of their teams.  (Thamvanthongkham Dep. 197:11-198:4, 200:3-18.)

Outside of reimbursable travel, Mr. Thamvanthongkham and other supervisors sometimes performed work at locations other than their homes (such as "coffee shops" and "libraries"), though he personally has no recollection of any such occasion by location or date. Supervisors did so at their personal discretion and "preference," the extent of it "varie[d]," and there be would no records documenting how much work was actually completed (or time spent) at non-home locations.  (*Id.* 80:24-82:17, 84:13-85:6, 86:6-25, 88:7-89:4, 90:10-19, 92:10-93:8, 101:16-102:10, 153:24-154:12, 178:18-23, 179:8-19, 180:20-25, 181:11-17, 203:10-23, 204:19-205:10; Thamvanthongkham Rog Responses at 6-7.)  Inquiries of individual supervisors would be required to obtain such information.  (Thamvanthongkham Dep. 93:9-23.)

### 4.      Christina Beecroft

Ms. Beecroft worked as a background investigator IV and mentor.  (Beecroft Dep. 69:13-70:2; Pls. Ex. 8.)  She was assigned to a "home office" in Virginia.  (*Id.*; Beecroft Dep. 27:24-28:15, 78:20-79:5, 182:21-24.)  Ms. Beecroft was responsible for assisting, monitoring, and evaluating mentees in conducting their assigned background investigations, as well as for completing her own investigation cases, often "shadowed" by mentees.  (*Id.* 68:19-69:12, 75:24-77:7, 79:12-80:13.)  She operated in an assigned geographic region covering approximately 30 to 50 miles centered around the zip code of her residence in Woodbridge.  (*Id.* 77:18-78:23.)  Ms. Beecroft reported to Mr. Powell (the above-referenced field supervisor with his own "home

office"), and received background check case assignments directly from one of GDIT's assigners.  (Pls. Ex. 8; Beecroft Dep. 83:19-84:12, 162:12-166:5.)

Ms. Beecroft performed job-related tasks from her personal residence "often"—on average four to five days out of the workweek.  (*Id.* 26:18-26:23; 200:7-206:16.)  These included preparing ROIs, making scheduling calls, filling out her manifest, logging mentoring activities, and completing paperwork.  (*Id.* 26:18-26:23; 100:12-16, 101:13-16, 104:8-12, 200:7-206:16; Beecroft Rog Responses at 3-4.)  Ms. Beecroft maintained Company-funded work equipment in her home, including a laptop and a printer that she kept in a "spare bedroom" along with a filing cabinet for PII storage.  (Beecroft Dep. 26:24-27:11, 208:12-213:9, 216:7-217:4; Beecroft Rog Responses at 4.)  She considered her residence to be her final duty location for manifesting purposes and exclusively printed case materials at home.  (Beecroft Dep. 158:5-10, 199:3-6, 199:11-15, 212:4-17).

Ms. Beecroft's job required some travel in order to conduct (or assist mentees in) interviews and record reviews and to perform check rides.  (Beecroft Rog Responses at 5-6.)  All or substantially all of Ms. Beecroft's work-related travel took place in her or a mentee's personal vehicle, began at Ms. Beecroft's residence, and stayed within her region.  (Beecroft Dep. 174:16-176:21, 189:7-11.)  None of it required overnight stays.  (*Id.* 178:4-7.)  In total, Ms. Beecroft reported reimbursable travel on approximately 23.2% of workdays.  (Appx. A.)

When not otherwise traveling for assignments, Ms. Beecroft sometimes chose to do portions of her work in public locations like "coffee shop[s]" and "libraries" in her region.  (Beecroft Dep. 219:5-221:17, 222:13-223:9, 230:5-12.)  She is unable to recall specific instances, and (with the possible exception of certain mentoring activity logs) there are no records documenting her decisions to work in these locations.  (Beecroft Rog Responses at 6-7;

Beecroft Dep. 85:5-12, 104:13-23, 221:18-22, 224:4-18.)  Such decisions were left to

employees' discretion and "preference[]," and practices varied.  (*Id.* 80:23-82:19, 104:24-105:24,

206:19-207:10, 224:4-8, 227:19-228:18; Beecroft Rog Responses at 7-8.)  Individual inquiry

would be needed to understand how much time investigators spent working at non-home

locations.  (Beecroft Dep. 86:10-87:2, 104:8-105:24, 207:11-18, 229:9-233:15.)

## ARGUMENT

## I.    CLASS CERTIFICATION STANDARDS

The class action device set out in Federal Rule of Civil Procedure 23 "is an exception to

the usual rule that litigation is conducted by and on behalf of the individual named parties only."

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Courts adjudicating class certification

motions must therefore take care to "protect . . . the right of the defendant to present facts or raise

defenses that are particular to individual class members."  *Thorn v. Jefferson-Pilot Life Ins. Co.*,

445 F.3d 311, 318 (4th Cir. 2006).  To that end, courts are required to "conduct a rigorous

analysis to ensure compliance with Rule 23, paying careful attention to the requirements of that

Rule."  *Id.* at 318; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Branch v.*

*Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 544 (E.D. Va. 2018) (Payne, J.).  In particular, courts

must "take a close look at the facts relevant to the certification question and, if necessary, make

specific findings on the propriety of class certification."  *Thorn*, 445 F.3d at 319.  "[F]indings

can be necessary even if the issues tend to overlap into the merits of the underlying case."  *Id.*;

*Dukes*, 564 U.S. at 350-51 (the "rigorous analysis" will "frequently . . . entail some overlap with

the merits of the plaintiff's underlying claim").  Thus, "a court should consider merits questions

to the extent that they are relevant to determining whether the Rule 23 prerequisites for class

certification are satisfied," and making that determination "definitive[ly]" may "require[] the

court to resolve an important merits issue."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357-58, 361

(4th Cir. 2014); *Comcast*, 569 U.S. at 35-36.

To warrant certification, a proposed class must satisfy several criteria.  First, it must comply with the four prerequisites established in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003).  Second, it must fall within one of the three categories enumerated in Rule 23(b).  *Id.*  Where, as here, a party seeks certification under Rule 23(b)(3) (*see* Br. at 23-29), it must show that "common issues predominate over individual ones and that a class action [is] superior to other available methods of adjudication."  *Gunnells*, 348 F.3d at 423.  Finally, the proposed class must be sufficiently "ascertainab[le]" that it is "administratively feasible" to "readily identif[y]" class members.   *EQT*, 764 F.3d at 358.  A "plaintiff's request for class certification must fail if any one of Rule 23's requirement is not met."  *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013); 1 McLaughlin on Class Actions § 3:11 (18th ed. 2021).

As the Fourth Circuit has "stressed in case after case . . . it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23."  *Thorn*, 445 F.3d at 321 (emphasis in original).  Rather, it is with "no exception" the "*plaintiff* who bears the burden of showing that the class *does comply*."  *Id.* at 321-22 (emphasis in original).  "Indeed, it is reversible error for the court to require the opponent . . . to disprove that class certification is appropriate."  1 McLaughlin on Class Actions § 3:11.  To carry their burden, plaintiffs "must do more than plead compliance"; they must "present evidence that the putative class complies with Rule 23."  *EQT*, 764 F.3d at 357; *Dukes*, 564 U.S. at 350 (movant "must affirmatively demonstrate" compliance).  "[A]ctual, not presumed, conformance" with Rule 23 is "indispensable."  *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982).

19

## II.   PREDOMINANCE IS LACKING BECAUSE SUBPART 6 CANNOT ESTABLISH ANY SINGLE SITE OF EMPLOYMENT ON A CLASSWIDE BASIS

Plaintiffs have not established predominance under Rule 23(b)(3).  There is only one merits issue that is meaningfully in dispute: whether the Falls Church Office constitutes the single site of employment for the putative class members.  Plaintiffs could never make that showing absent individualized mini-trials.  The Court would first have to determine that class members qualified as "truly mobile workers" under *Meson*, such that Subpart 6 could even *potentially* apply.  It is clear from the discovery record that variable work practices and habits, plus a dearth of common evidence—as repeatedly acknowledged by all four class representatives at deposition—would preclude classwide resolution of this question in Plaintiffs' favor.  Then, even if Subpart 6 potentially applied, the Court would still need to assess individuals' single sites of employment using the disjunctive guidelines of that provision, a fact-intensive exercise that would involve pinpointing where class members "reported" or were "assigned" work, in a context where most or all of their supervisors and assigners were based in home offices.

### A.   Predominance Standard

To establish predominance, "plaintiffs must show that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  *Gunnells*, 348 F.3d at 459.  Common questions can be answered for all class members using the "same evidence" or are otherwise "susceptible to generalized, class-wide proof," while individual questions require "evidence that varies from member to member."  2 Newberg on Class Actions § 4:50 (5th ed. 2021).  The predominance inquiry is distinct from, and "far more demanding" than, that for Rule 23(a)'s commonality requirement.  *Gunnells*, 348 F.3d at 459.  Importantly, "[t]he Court cannot just examine whether common questions outnumber noncommon ones."  *Branch*, 323 F.R.D. at 550.  That is because the "test is qualitative rather

than quantitative": it "compares the quality of the common questions to those of the noncommon questions" and focuses on the "the qualitatively overarching issue[s] in the litigation." *Id.* (predominance lacking despite plaintiff "correctly identifying" common questions); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 622-23 (1997). As such, "the mere fact that the defendant[] engaged in uniform conduct is not, by itself, sufficient" to show predominance. *EQT*, 764 F.3d at 366. Indeed, "[e]ven a plethora of identical practices" is insufficient "if the defendant['s] common conduct has little bearing on the central issue in the litigation." *Id.*[7]

"In practice, the predominance requirement asks whether a trial meant to resolve class-wide issues is manageable or whether it is likely to devolve into a series of mini-trials examining questions specific to individual plaintiffs." *Seaman v. Duke Univ.*, 15-CV-462, 2018 WL 671239, at *3 (M.D.N.C. Feb. 1, 2018); *see also Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) also requires [courts] to consider how a trial on the merits would be conducted if a class were certified.");1 McLaughlin on Class Actions § 3:12 (courts must consider the "kind of evidence that would need to be adduced, and how the case would be tried"). Accordingly, courts are "required to consider the defenses" in the case "as well as the claims" when "testing predominance." *Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 107 (D. Md. 2010); *see also EQT*, 764 F.3d at 370. In particular, for certification to be warranted, "the record must *affirmatively* reveal" that "resolution" of an anticipated defense "on its merits may be accomplished on a class-wide basis." *Thorn*, 445 F.3d at 321-22 (emphasis added) (it is "not enough" that a defendant has failed to show that the defense presents individualized issues).

---

[7] For these reasons, Plaintiffs cannot establish predominance simply by identifying a number of substantially uncontested "common" questions focusing on GDIT's "employer" status or the timing of its reductions in force. (Br. at 20, 24.) *See, e.g., Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) ("[t]he 'conceded issues' in this case . . . are clearly less substantial in the overall mix of issues this case presents when compared to the ultimate (contested) question the district court would have to decide in any potential class action").

Here, GDIT anticipates defending the merits of this action principally, if not exclusively, by arguing that the Falls Church Office does not constitute the putative class members' single site of employment.  As shown below, Plaintiffs—who will bear the burden of proving a statutory "plant closing" or "mass layoff"—cannot prevail on this issue on a classwide basis.

**B.      "True Mobility" Cannot Be Shown on a Classwide Basis**

**1.      The _Meson_ Test Is Holistic and Circumstance-Dependent**

Plaintiffs concede that Subpart 6's application depends entirely upon whether the putative class members are "truly mobile workers" under _Meson_.  (Br. at 24-25.)  As explained, that standard is holistic.  Job duties requiring even "significant travel" are legally insufficient in and of themselves.  _Meson_, 507 F.3d at 804, 809-11 (employee who "travelled to visit clients in her region" not truly mobile); _Storehouse_, 2010 WL 4453849, at *1, 3-4 (employee who "spent much of his time traveling" to depots "spann[ing] from New Jersey to Florida to Texas" not truly mobile).  Even in the case of employees with travel responsibilities, then, courts must consider whether they also maintained some "regular, fixed place of work," whether the job in question was effectively "_characterized_ by travel and mobility" in the manner of the "bus drivers and railroad workers" listed as examples in Subpart 6, and whether applying Subpart 6 under the circumstances would serve "the purposes of the WARN Act" in protecting geographic "communities."  _Meson_, 507 F.3d at 804, 809-11 (emphasis added).

Plaintiffs' claimed ability to establish "truly mobile worker" status on a classwide basis is premised on at least two mischaracterizations of the Fourth Circuit's test.  (Br. at 25-26.)  First, Plaintiffs argue that Subpart 6 applies whenever an employee's job "involve[d] work outside any of the employer's regular employment sites."  (_Id._ (quotation marks omitted).)  But _Meson_ itself forecloses that interpretation, holding that while the terms of Subpart 6 "could be read literally to cover almost any employee who leaves her office," it was "intended to apply _only_ to truly mobile

workers without a regular, fixed place of work." *Meson*, 507 F.3d at 809-10; (First MTD Opinion at 8-10). This Court has already recognized accordingly that employees merely "'work[ing] remotely'" and/or "from their homes"—that is, outside of any site owned or operated by GDIT—is insufficient to warrant application of Subpart 6. (*Id.* at 2, 6-11.)

Second, Plaintiffs claim that *Meson* "define[s]" a fixed place of work to be a "business office of the company" such that class members' home offices are irrelevant. (Br. at 25.) But *Meson* contains no such definition. Nor did anything about the panel's analysis turn on the fact that the plaintiff sales manager's "regular, fixed place of work" happened to be a small company "office." To the contrary, *Meson* indicates the opposite, defining a "truly mobile worker" as one lacking a "fixed *workplace or* office." 507 F.3d at 809-10 (emphasis added); *see also Storehouse*, 2010 WL 4453849, at *3-4 (single site could be either plaintiff's small local "office" *or* his "residence in Richmond" if that was his "fixed workspace when not traveling"); *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1152 (10th Cir. 2004) (employee had "fixed place of work" at facility of separate company where employer provided housekeeping services).

### 2.  The Common Evidence Proffered by Plaintiffs Is Insufficient to Show "True Mobility"

Stripped of its mischaracterizations of the *Meson* standard, Plaintiffs' Opening Brief confirms that there is no "common bod[y] of evidence" permitting a classwide showing of "true mobility." Each of the sources Plaintiffs identify (Br. at 13, 24, 26-27) is insufficient:

- ***"Investigator Travel" Task Entries in "Labor Hours Reports."*** The "Labor Hours Reports" (which consist of time entries as input by employees themselves) reflect only about 2.2% of total time among OPM Program employees billed to the "Investigator Travel" code from January to October 2019—the only year in which it was available. (*See* Appx A.) *The four class representatives themselves did not bill to the code at all* during that time period. (*Id.*) Plaintiffs nowhere explain how such limited records could conceivably show true mobility on a classwide basis.

- ***Travel expense reimbursement request records.*** Expense records reflect reported

miles travelled for official, reimbursable purposes, such as witness interviews or on-site record reviews.  (*See, e.g.*, Shartle Dep 156:21-157:2; Beecroft Dep. 232:16-233:15.)  But that sort of assignment-specific travel is legally insufficient to show true mobility under *Meson*.  In any event, these records show immense variability in the amount of travel reported (*see* Appx. A), and Plaintiffs provide no method by which they could use this data to demonstrate classwide true mobility.

- *"Daily manifest check-ins and check-outs."*  Daily manifests were only required to reflect the date, employee name, case identifiers, and document identifiers—not where employees took materials or how long they spent with them.  (Pls. Ex. 26 at GDIT-000029538.)[8]

- *Check ride forms*.  Check rides were intermittent events, conducted once per quarter during an investigator's first year on the job and only approximately once a year thereafter.  (Pls. Ex. 6 at GDIT-000031605, 31610; Beecroft Dep. 105:25-107:12.)  Again, Plaintiffs nowhere explain how checklists from these sessions could demonstrate "true mobility" on a classwide basis.

- *"Daily task records" from GDIT's case management system ("CMS")*.  CMS records may reflect how many official investigative tasks (such as interviews or record reviews) particular investigators completed but do not show the location of the work.  (Shartle Dep. 156:10-157:2.)  Moreover, any argument that job duties requiring travel could alone demonstrate "true mobility" is foreclosed by *Meson*.

- *"Free[dom]" to Work from Public Locations*.  Any suggestion that "true mobility" could be established by the purported *absence* of an express *prohibition* on working from public locations is similarly meritless.  *Meson* does not focus on how employees *could* have worked but rather on how they *actually* worked.  And the record confirms that (i) there are no records of any time actually spent discretionarily working from public locations and (ii) any such time would be hopelessly individualized across class members.  (*See supra* 12-18; Shartle Dep. 154:8-15, 156:18-20, 186:10-15.)[9]

Nor does Plaintiffs' proposed "travel subclass" (Br. at 18) ameliorate these deficiencies.

As shown, even the investigators and supervisors included in that subclass varied substantially in their levels of reimbursable travel and practices with respect to non-travel work outside the home office, precluding certification of a subclass.  *See, e.g.*, *Farrar & Farrar Dairy, Inc. v. Miller-St.*

---

[8] Moreover, GDIT was required to return manifest records to OPM at the conclusion of the Program, and Plaintiffs offer no information about their accessibility for evidentiary purposes.  (OPM Contract at GDIT-000043180.)

[9] High-level "job dut[y]" descriptions (Br. at 26-27) are also insufficient to establish true mobility on a classwide basis given the "significant . . . variation" evident in class members' actual day-to-day practices.  *See, e.g.*, *Gales v. Winco Foods*, No. C09-05813, 2011 WL 3794887, *6-10 (C.D. Cal. Aug. 26, 2011); *Schuyler v. Morton's of Chicago, Inc.*, CV 10–06762, 2011 WL 13274238, at *6-9 (C.D. Cal. Jun. 13, 2011).

24

*Nazianz, Inc.*, 254 F.R.D. 68, 76-78 (E.D.N.C. 2008) (even "skillful subclassing" could not

overcome the "individual . . . issues that are certain to arise").  As discussed further below,

moreover, even if *all* such employees engaged in "significant" travel (like the unsuccessful

*Meson* plaintiff), that would still be insufficient absent additional showings particular to specific

individuals.  And GDIT would be entitled to mount individualized defenses (for example, that

the employee in question maintained a "fixed" workspace in his or her home).  (*See infra* 28-29.)

### 3.     The *Meson* Inquiry Will Demand Individualized Proof

Without the benefit of common evidence, putative class members would need to submit

individualized evidence on the "true mobility" question.  It is unavoidable that such evidence

would differ significantly across employees.  As demonstrated, the record reflects overwhelming

variability in class members' reimbursable travel and practices with respect to working outside

their homes.  Some, like Ms. Piron, reported none of the former and admittedly worked outside

of the home office only to the extent of taking occasional phone calls or making monthly trips to

FedEx.  (*See supra* 12.)  A handful reported upward of 400 instances of reimbursable travel.

(*Id.*)  The majority fall somewhere in between.  (Appx A.)  Outside of reimbursable travel, the

class representatives themselves repeatedly testified that it was entirely up to the discretion and

preference of individual employees whether to work, for example, from a library or coffee shop

(and even class members doing so may well—like the representatives—have also maintained

"fixed" home work spaces).  (*See supra* 12-18; Thamvanthongkham Dep. 134:20-135:25,

178:18-23, 181:11-17 (investigators' decisions to complete work at public locations were "based

on their discretion" and "preference[s]").)  Plaintiffs all further agreed that practices almost

certainly varied between class members (as well as over time for given individuals) and that no

records of personal practices exist, requiring individualized inquiry of former employees.  (*See*

*supra* 12-18.)  The need to apply *Meson* to the enormous range of possible circumstances

presented by the Proposed Classes, combined with the need for "individualized proof" across

members, precludes a finding of predominance.  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 149

(4th Cir. 2001); *Thorn*, 445 F.3d at 320-23 (court would have to "inspect [plaintiffs'] individual deposition testimony" to adjudicate defense as to individual class members); *EQT*, 764 F.3d at 366-71 ("individualized nature" of evidence destroyed predominance); *Branch*, 323 F.R.D. at 550-52.

In the WARN Act context specifically, courts have frequently denied class certification where individualized single-site-of-employment determinations would be required.[10]  So too have they found predominance lacking where the viability of labor and employment claims more generally would turn on assessments of class members' actual, day-to-day work practices in the face of evident "variances."  *See, e.g.*, *Myers*, 624 F.3d at 548-51 (claims depended on whether employees worked in "a bona fide executive capacity" and testimony indicated "variances" among class members' actual managerial duties); *In re Family Dollar FLSA Litig.*, 3:12-CV-1951, 2014 WL 1091356, at *3-5 (W.D.N.C. Mar. 18, 2014) (on motion for collective action certification, record revealed "significant variation" in employees' "actual managerial duties," necessitating "fact-specific inquiry into the daily duties of each"); *Aronson v. Gannett Publ'g Servs., LLC*, No. EDCV19-996, 2020 WL 2891940, at *5-8 (C.D. Cal. May 29, 2020) (question of whether class members were independent contractors based on actual job performance "riddled with individualized issues"); *Manigo v. Time Warner Cable, Inc.*, 2:16-CV-06722, 2017 WL 5149225, *5-6 (C.D. Cal. Apr. 4, 2017).[11]  The same result should obtain here.[12]

---

[10] *See, e.g.*, *Austen v. Catterton Partners V, LP*, 268 F.R.D. 146, 147-48, 150, 152-53 (D. Conn. 2010) (denying certification on predominance grounds where single sites of employment for remote employees were disputed and it was "not clear" whether "individualized inquiries for each remote employee w[ould] be necessary to determine Defendants' liability"); *Likes v. DHL Exp.*, 288 F.R.D. 524, 540 (N.D. Ala. 2012) ("nuances surrounding the single site of employment inquiry" would preclude a "generalized decision applicable to the nationwide class").

[11] Plaintiffs cite no decision certifying a class of home-based employees over a *Meson*-based challenge.  The authorities they claim involved "remote" workers either (i) come from jurisdictions that do not adhere to *Meson*'s interpretation of Subpart 6 as limited to truly mobile workers (and turned in part on a lack of opportunity for discovery) or (ii) involve settlement classes certified on joint motion with no discussion of Subpart 6.  (Br. at 15.)

[12] For similar reasons, the Proposed Classes also fail Rule 23's ascertainability, commonality, and superiority requirements, given the lack of classwide proof and need for individualized fact-finding to answer the one meaningfully disputed merits issue in the case.  *See, e.g.*, *EQT*, 764 F.3d at 358-63 (no ascertainability or commonality); *Likes*, 288 F.R.D. at 541 (superiority); *Branch*, 323 F.R.D. at 553 (superiority).

**4.      Certification Would Deprive GDIT of Its Right to Litigate Its**
***Meson*-Based Defense Against Individual Class Members**

For many of the same reasons, certification would impermissibly deprive GDIT of its

right to litigate the merits of its *Meson* position against individual class members.  "Because the

Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge or modify any substantive

right . . . a class cannot be certified on the premise that [a defendant] will not be entitled to

litigate its statutory defenses to individual claims."  *Dukes*, 564 U.S. at 367; *Windham v. Am.*

*Brands, Inc.*, 565 F.2d 59, 66-67 (4th Cir. 1977) (predominance lacking where "[g]eneralized or

class-wide proof of damages" would "contravene the mandate of the Rules Enabling Act").

Should this case proceed, GDIT intends to continue arguing that many, most, or all class

members do not constitute truly mobile workers (and thus have no claims (First MTD Opinion at

9-11)).  Among other things, it would show that employees (i) seldom, if ever, *actually* worked

outside of their residences beyond the sort of assignment-specific "travel" that *Meson* deems

legally insufficient to invoke Subpart 6, and (ii) maintained "fixed workspace[s]" by virtue of the

setup and usage of their home offices.  507 F.3d at 804, 809-11.  But, *as all four class*

*representative themselves concede*, doing so would require individualized inquiries.  (*See supra*

12-18.)  Plaintiffs offer no practicable mechanism for conducting hundreds or more of such

inquiries without overwhelming the broader litigation.

Take, for example, a hypothetical former employee who claimed "truly mobile" status

based on purportedly working out of various Starbucks locations.  GDIT would have every right

to cross-examine that employee on precisely what tasks she performed at Starbucks, with what

frequency, and for how long.  And it would further be entitled to show the factfinder evidence

that the employee also made regular use of a robust home office setup furnished with Company

equipment.  But a class proceeding would prevent GDIT from "genuinely challeng[ing]" the

employee on this "element of [her] affirmative case" in any sort of "administratively feasible"

manner.  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018) ("plaintiffs pointed to

no documents or admissions" that could substitute for opportunity to raise individual challenges);

*cf. Gunnells*, 348 F.3d at 437-38 (defendants entitled "to introduce evidence to rebut

[presumption of reliance] with respect to individual[s]"); *Thorn*, 445 F.3d at 318.

### C. Identifying Class Members' Single Sites of Employment Under Subpart 6 Would Raise Still More Individualized Questions

Still more individualized questions arise from Subpart 6's guidance for actually assigning

even *bona fide* truly mobile workers to single sites of employment.  If the "true mobility"

prerequisite is satisfied, Subpart 6 then defines the employee's single site of employment as the

location (i) "to which they are assigned as their home base," (ii) "from which their work is

assigned," or (iii) "to which they report."  20 C.F.R. § 639.3(i)(6).  The Fourth Circuit has not

definitively construed these terms.  But other courts of appeals have concluded that an

employee's "home base" is "the place from which he leaves at the start of the work period and/or

returns to at the end of the work period, or at the very least, where he is physically present at

some point during a typical work period."  *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 819-20

(9th Cir. 2007) (collecting cases).  The location "from which [employees'] work is assigned" is

where actual, day-to-day assignments are "originated" or where "day-to-day management of the

workers . . . occur[s]."  *Id.* at 820-21.  And the location "to which [employees] report" is the

place where "employees' job performance and work product [are] evaluated."  *Id.* (reporting for

"purposes of payroll and other centralized administrative functions is insufficient").

Plaintiffs identify no classwide evidence to prove that putative class members "le[ft]"

from or "return[ed] to" anywhere other than their home offices during typical workdays or that

they were "physically present" at the Falls Church Office in any meaningful sense.  If anything,

the record shows that visitation to the Falls Church Office is likely to have varied considerably. (*See, e.g.*, Merino Dep. 217:20-219:11 (20 to 25 occasions for trainings or meetings); Beecroft Dep. 182:3-19 (two to three occasions total); (Thamvanthongkham Dep. 190:8-14, 192:18-23 (once or twice yearly).)  In addition, the putative class members were managed by, received day-to-day assignments from, and submitted written work product for evaluation to a variety of people (including field supervisors, case reviewers, case reviewers' own supervisors, operations managers, and, in some cases, OPM itself).  In the case of the Plaintiffs themselves—and, GDIT records suggest, in the overwhelming majority of cases—all such individuals within GDIT were based in home locations all over the U.S.  (Pls. Ex. 8.)  Especially given this variance, Plaintiffs identify no evidence that could support a classwide determination that personnel in the *Falls Church Office* were in fact responsible for the actual, day-to-day management or evaluation of class members—even if certain "statistical" productivity data ultimately "flowed up" the "management chain."  (Shartle Dep. 169:22-170:3; Br. at 3); *Bader*, 503 F.3d at 820-22 (employees "reported directly to local supervisors" and "were not directly assigned any work" from headquarters); *Rangel v. Ensign U.S. Drilling (Cal.) Inc.*, 1:15-CV-01042, 2017 WL 4310244, at *5-6 (E.D. Cal. Sept. 28, 2017) ("accounting, billing, payroll, and other administrative or personnel functions cannot constitute assignment of work").  At a minimum, any assertions that class members "reported" to, or had their work "assigned" from, the Falls Church Office in some sort of indirect or figurative manner would be highly subjective.  And, as discussed above, GDIT would be entitled to challenge such positions on an individualized basis.

## III.    PLAINTIFFS' BELATED REFERENCE TO SUBPART 8 CHANGES NOTHING

Plaintiffs' untimely invocation of Subpart 8 does not alter the predominance analysis. (Br. at 27.)  For one thing, Plaintiffs have neither pled facts in the SAC suggesting that Subpart 8 applies nor even attempted to adduce any such facts in discovery—the former after the

possibility was expressly raised at oral argument (*see supra* 6 n.3).  It is therefore unsurprising that Plaintiffs' half-hearted nod to the provision now is unaccompanied by evidence or authority, a deficiency that alone precludes a finding of predominance on this theory.  *See Thorn*, 445 F.3d at 321-22 (Rule 23 burden lies always with plaintiffs); *Sisney v. Trinidad Drilling, LP*, 231 F. Supp. 3d 233, 243 (W.D. Tex. 2017) ("no evidence" to support "passing assertion" of Subpart 8's applicability); *Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1219 n.25 (D. Kan. 2003) (same).  Indeed, Plaintiffs fail even to explain how the Court could go about determining whether the Falls Church Office was any given class member's (much less all members') single site of employment even if GDIT *was* a "truly unusual organization[]."  20 C.F.R. § 639.3(i)(8).

In all events, courts have determined that a "large, commonly owned corporation" (like GDIT) having "local, independent" operations (like those at the class members' home offices) does not alone warrant application of Subpart 8.  *Davis*, 728 F.3d at 487-88; *Rifkin v. McDonnel Douglas Corp.*, 78 F.3d 1277, 1280-81 (8th Cir. 1996) ("[a]ny connection between the two sites is nothing more than that present in most large corporate organizations"); *Rangel*, 2017 WL 4310244, *8 (rejecting "broad reading" of Subpart 8 that would "make virtually every corporate headquarters a single site of employment, regardless of how employees interact with it").  And they have stressed that reasonable geographic proximity between locations—absent in the nationally dispersed Proposed Classes here—remains critical.  *Davis*, 728 F.3d at 488.[13]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied in full.

---

[13] Plaintiffs' proposed class definition (Br. at 17) is also overbroad because it purports to include former employees holding *any* positions within the OPM Program rather than positions substantially similar to those of the class representatives.  Plaintiffs have not pled facts, taken discovery, or marshalled evidence regarding any categories of employees other than background investigators, field supervisors, case reviewers, and case reviewer supervisors.  *Cf. McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 469-70 (E.D.N.C. 2010) (limiting FLSA class to employees similarly situated to class representatives).  Finally, GDIT reserves the right to request an opportunity to be heard on Plaintiffs' proposed form of class notice (Pls. Ex. 37), as necessary and at an appropriate time.

Respectfully submitted,

Dated: December 8, 2021                    /s/ *Neil H. MacBride*
                                    _____

                                    Neil H. MacBride (Va. Bar No. 79883)
                                    DAVIS POLK & WARDWELL LLP
                                    901 15th Street, N.W.
                                    Suite 1200
                                    Washington, D.C. 20005
                                    Telephone:     (202) 962-7000
                                    Facsimile:     (212) 962-7111
                                    neil.macbride@davispolk.com

                                    Paul S. Mishkin
                                         (admitted *pro hac vice*)
                                    Craig J. Bergman
                                         (admitted *pro hac vice*)
                                    Marie Killmond
                                         (admitted *pro hac vice*)
                                    DAVIS POLK & WARDWELL LLP
                                    450 Lexington Avenue
                                    New York, New York 10017
                                    Telephone:     (212) 450-4000
                                    Facsimile:     (212) 701-5800
                                    paul.mishkin@davispolk.com
                                    craig.bergman@davispolk.com
                                    marie.killmond@davispolk.com

                                    *Attorneys for Defendant General Dynamics*
                                    *Information Technology, Inc.*