IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MOLLIE PIRON, et al.,

    Plaintiffs,

v.                         Civil Action No. 3:19cv709

GENERAL DYNAMICS
INFORMATION TECHNOLOGY, INC.

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF ("Class Certification Motion") (ECF No. 61). For the reasons set forth below, the motion will be granted.

### I. BACKGROUND

Mollie Piron, Stephanie Merino, Bounsou Thamvanthongkham, and Christina Beecroft ("Plaintiffs"), on behalf of themselves and all other similarly situated individuals, request that the Court certify their claims against General Dynamics Information Technology ("GDIT" or "Defendant"). See ECF No. 61. The Second Amended Complaint, in its sole CLAIM FOR RELIEF, alleges that GDIT violated the Worker Adjustment and Retraining Notification Act ("WARN" Act) (29 U.S.C. § 2101, et seq.) by not providing at least "60 days' notice prior to terminating 500 or more employees in a mass layoff, or before terminating 50 or more employees in a plant

closing." SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. ("SAC") (ECF No. 49 ¶ 6). In its PRAYER FOR RELIEF, the SAC seeks to recover up to 60 days of wages and benefits of various kinds. Id. GDIT opposes class certification by arguing that the predominance requirement of Rule 23(b)(3) has not been established. GDIT does not contest any of the other factors under Rule 23 as substantiated in the Class Certification Motion. See DEFENDANT GDIT's MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 72). The crux of the predominance issue is whether Plaintiffs and Putative Class Members can claim a "single site of employment" under the WARN Act by relying on Department of Labor ("DOL") regulations promulgated in Subpart 6 (20 C.F.R. § 639.1(6)).

## A.    The WARN Act

Before assessing the arguments for, and in opposition to, class certification, it is necessary to provide a brief background on the WARN Act.

Enacted in 1988, the WARN Act requires employers to provide notice of abrupt, substantial employment terminations in order to enable workers to seek alternative employment and to prepare communities for economic disruption. See Meson v. GATZ Tech. Servs. Corp., 507 F.3d 803, 808 (4th Cir. 2007) (relying on Bader v. N. Line Layers, Inc., 503 F.3d 813 (9th Cir. 2007)); 20 C.F.R. §

2

639.1(a)). The WARN Act requires employers to provide 60 days written notice to employees before effectuating a "mass layoff" or "plant closing". 29 U.S.C. § 2102(a). Under the WARN Act, employees may bring a claim of action when they incur a covered employment loss without such notice, and employers who fail to give this notice are liable to each affected employee for back pay, benefits, and attorneys' fees. 29 U.S.C. § 2104.

The WARN Act defines "mass layoff" as a reduction in workforce at a "single site of employment" that impacts at least 33 percent of the employees and a minimum of 50 employees in a 30-day period. 29 U.S.C. § 2101(a)(3). The WARN Act does not define the term "single site of employment." However, DOL, the federal agency responsible for administering the statute, has defined through regulations a "single site of employment" as "either a single location or a group of contiguous locations." 20 C.F.R. § 639.3(g)(i)(1).

The parties in the present case dispute whether certain requirements of the "single site of employment" regulations, particularly Subpart 6, apply to Plaintiffs and Putative Class Members:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is the assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6).

Courts apply a highly deferential, narrow standard of review for interpretative regulations promulgated by federal agencies. See generally Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 200) ("Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.") (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

In the Fourth Circuit, courts must not only defer to DOL's regulatory interpretation, but also apply the standard set forth by Meson for determining "single site of employment" under Subpart 6 of the regulations when reviewing WARN Act claims. See Meson, 507 F.3d at 809-10. In Meson, the Court of Appeals held that Subpart 6 was "intended to apply only to truly mobile workers without a regular, fixed place of work." Id. at 809.

4

**B.   Procedural History**

On September 27, 2019, Plaintiffs filed a Complaint claiming that GDIT had violated the WARN Act by not providing Plaintiffs and Putative Class Members at least 60 days advance written notice of their terminations. See CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. (ECF No. 1). On March 10, 2020 Plaintiff's AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ. (ECF No. 5) was dismissed, without prejudice, pursuant to the ORDER (ECF No. 38) and the accompanying MEMORANDUM OPINION (ECF No. 37). In the opinion, the Court determined that the Amended Complaint failed to allege the requirements for the definition of "mobile worker" under Meson because Plaintiffs had not adequately alleged that they fell within Subpart 6. Piron v. Gen. Dynamic Info. Tech., Inc., No. 3:19-cv-709, 2020 WL 115983, at *3-4 (E.D. Va. Mar. 10, 2020). However, Plaintiffs were afforded leave to file another amended complaint "if, upon careful examination, the Plaintiffs' counsel can file such a pleading consistent with the requirements of Fed. R. Civ. P. 11." ORDER (ECF No. 38).

On April 27, 2020, Plaintiffs subsequently filed the SAC which alleges that GDIT violated the WARN Act by failing to give adequate written notice 60 days before ordering a mass layoff between July 3, 2019 through September 13, 2019 that resulted in "employment losses" for at least 50 of Defendant's employees as well as 33

5

percent of Defendant's workforce at the GDIT facility in Falls Church, Virginia. ECF No. 39 ¶¶ 139-40, 145-46. The premise for that allegation is the assertion that the Falls Church facility was the single site of employment for Plaintiffs and Putative Class Members. Id. ¶ 142.

GDIT filed DEFENDANT GDIT's MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 41) which was denied because "the Second Amended Complaint alleges facts from which it plausibly could be held that the plaintiffs and class members fit within the so-called 'mobile worker' category [in Meson]. . ." However, the Court also noted that "further development of the record [may] necessitate a different conclusion after the end of discovery." ORDER (ECF No. 50 at 2).

Thereafter, "the parties . . . completed more than two months of class certification discovery, including production of over 40,000 pages of documents, interrogatories, and positions." ECF No. 72 at 13 (referencing ECF Nos. 51, 54). Plaintiffs subsequently moved for PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 61). Timely replies and responses were filed.

## C. Factual Background

GDIT is an information technology company headquartered in Falls Church, Virginia. ECF No. 39 ¶ 14. In the Spring of 2018, GDIT acquired CSRA, Inc. ("CSRA"), a company that performed federal agency employee background checks for the Office of Personnel Management ("OPM"). Id. at 1, ¶ 17. The CSRA/OPM contract was an asset to which GDIT succeeded when it acquired CSRA. Id.

Plaintiffs and Putative Class Members were employed by the CSRA and became employed by GDIT after it acquired CSRA. After the CSRA employees, which included about 1,200 Investigators and 300 Reviewers, became employees of GDIT, they continued to work on the OPM contract within GDIT as part of GDIT's Civil and Homeland Security Group. Id. at 1.

To support performance of the OPM contract, GDIT maintained a Program Management Office ("PMO") in Falls Church, Virginia. The PMO was divided into two sections: operations management functions and corporate program support. See Ex. 6, ECF No. 66-6 at 14-16, 81. Plaintiffs and Putative Class Members were employed in the PMO's operations management section, which oversaw what GDIT described as its "mobile workforce." Id. at 14, 19, 31. Continuity for field investigations across the country was enabled by GDIT's software known as Case Management System ("CMS"). Id. Operations management employees, including the field investigative staff reported to the PMO. Id. at 14-15.

7

GDIT's hierarchical nature created a management system whereby the PMO led "the daily priorities of the teams" including those within the Operations Field Branch and Operations Quality Branch (i.e., the "mobile workforce"). ECF No. Ex. 11, 66-11 at 3-4, 9. Works assignments originated from the PMO, led by Anthony Durante, who was situated in GDIT's Falls Church, Virginia office. ECF No. 39 at 1-2; Ex. 22, ECF No. 66-22. According to the PMO Falls Church Office Organizational Chart, the majority of employees were considered remote resources, who were subject to Durante's oversight either directly or indirectly. See Ex. 22, ECF No. 66-22 at 2 (representing Durante as responsible for the Operations Managers and Workload Team); Ex. 6, ECF No. 66-6 at 81 (representing Durante as responsible for the Field Supervisors and Case Reviewers).

GDIT employees were located in various locations across the country in order to support, and, to efficiently perform, the field investigations required under the OPM contract. Id. at 81-82. GDIT divided its fieldwork staff into four groups: Background Investigators ("Investigators"), Field Supervisors ("Supervisors"), Case Reviewers (including Quality Analysts), and Case Reviewer Supervisors. ECF No. 39 ¶¶ 40, 43; ECF No. 66 at 2, n. 4. GDIT's performance of the OPM contract began when OPM sent to GDIT requests for background investigations for people who applied for jobs at OPM. Then, GDIT would assign the background

8

investigation for the applicant to Investigators, ECF No. 39 ¶ 18, who were divided into teams that reported to Supervisors. Id. ¶ 42. Investigators typically worked from their homes from which they traveled to the situs of the interviews so that they could conduct interviews face-to-face. Id. ¶ 20-21. Senior Investigators also could act as Mentors to new Investigators. Id. ¶ 41.

Supervisors worked from their homes. Their job was to assist Investigators in establishing and navigating investigations, provided feedback to Investigators, and performed ride-along check-ins during field investigations. Id. ¶¶ 42, 57, 85, 87, 88.

Case Reviewers typically worked from their homes. Their job was to determine whether a case needed to be reopened and further investigated by an Investigator. Id. ¶¶ 121-23. Case Reviewers were assigned cases by the PMO and their reports went to the PMO. Id. ¶ 124.

While employed by GDIT, Piron served as a Quality Analyst Associate performing case reviews and worked remotely from her home in North Dakota until her termination on or about July 3, 2019.[1] Merino was employed as an Investigator III and worked remotely from her home in Virginia until her termination on or about September 5, 2019. Thamvanthongkham was employed as a

---

[1]    Quality Analysts are considered part of the Case Review team based on the depositional testimony and briefings. See ECF No. 66 at 2, n. 4.

Supervisor and worked remotely from his home in Virginia until his termination on or about July 3, 2019. Beecroft was employed as an Investigator IV/Mentor and worked remotely from her home in Virginia until on or about August 7, 2019. Id. ¶¶ 10-13; ECF No. 43 ¶¶ 10-13; Ex. 8, ECF No. 66-8. According to the SAC, these employees "did not work at any site owned, occupied or controlled by GDIT." ECF No. 39 at 2. This apparently refers to the record evidence that, GDIT's employees who worked from home were permitted to do their work from other locations, such as coffee shops, at the employee's election. Id. ¶¶ 66, 100.

GDIT's hierarchical nature created a management system whereby the PMO led "the daily priorities of the teams" including those within the Operations Field Branch and Operations Quality Branch (i.e., the "mobile workforce"). ECF No. Ex. 11, 66-11 at 3-4, 9. Works assignments originated from the PMO, led by Anthony Durante, who was situated in GDIT's Falls Church, Virginia office. ECF No. 39 at 1-2; Ex. 22, ECF No. 66-22. According to the PMO Falls Church Office Organizational Chart, the majority of employees were considered remote resources, who were subject to Durante's oversight. Ex. 22, ECF No. 66-22 at 2 (representing Durante as responsible for the Operations Managers and Workload Team); Ex. 6, ECF No. 66-6 at 81 (representing Durante as responsible for the Supervisors and Case Reviewers).

10

In the Spring of 2019, GDIT determined that the OPM contract would soon end, and the company began to terminate employees in its Civil and Homeland Security Group. ECF No. 39 ¶ 1. GDIT sent the first wave of termination letters on June 19, 2019, informing employees that their employment would end on July 3, 2019. Id. ¶ 2. Subsequent waves of layoffs occurred on July 26, 2019 and August 16, 2019, and a final wave of termination letters was sent on August 22 and 26, 2019 with termination dates set for September 5 or 13, 2019. Id. at ¶¶ 3-4.

The SAC alleges that, in taking those actions, GDIT violated the WARN Act by failing to provide 60 days' advance written notice of terminations to employees:

> who worked at, reported to, or received assignments from one of Defendant's Facility and were terminated without cause beginning on or about July 3, 2019 through September 5, 2019, and within 90 days of those dates, or were terminated without cause as the reasonably foreseeable consequence of the mass layoff and/or plant closing ordered by Defendant beginning on or about July 3, 2019, and who are affected employees.

Id. ¶ 126. The employees include approximately 1,200 Investigators and Supervisors and about 300 Case Reviewers. Id. at 1.

## D. Proposed Class and Subclass

In the Class Certification Motion, Plaintiffs request the Court to certify the proposed class as a subclass pursuant to Fed. R. Civ. P. 23, comprising:

> The GDIT employees who worked on its OPM contract and were terminated between July and December 2019 and

11

have not filed a timely request to opt-out of the class.

[Case Management Subclass: Travel Subclass: The GDIT employees who worked on its OPM contract as Background Investigator, Project/Task Supervisor, or similarly situated positions and were terminated between July and December 2019 and have not filed a timely request to opt-out of the class.]

Plaintiffs also request that: (1) Raisner Roupinian LLP be appointed as Class Counsel; (2) Plaintiffs Piron, Merino, Thamvanthongkham, and Beecroft be the Class Representatives; and (3) the Court approve the form and manner of Notice. [PROPOSED] ORDER CERTIFYING A CLASS AND GRANTING RELATED RELIEF (ECF No. 61-1).

For the most part, the proposed class consists of the remote workers (who comprise 94 percent of the proposed class) and includes the employees who worked on the OPM contract, "including the 1,143 'remote resources' who reported up to [Program Director] Anthony Durante and provided field investigative services." ECF No. 66 at 2 (referencing BICS PMO Falls Church Office Org., Ex. 22, ECF No. 66-16 at 2-3). In addition, the proposed class includes approximately 70 employees who were physically at the Falls Church office. ECF No. 66 at 17.

## II. CLASS CERTIFICATION DISCUSSION

A class can be certified if Plaintiffs show that the four requirements of Fed. R. Civ. P. 23(a) are met <u>and</u> that the class fits the requirements of at least one of the class types outlined in Fed. R. Civ. P. 23(b). <u>Branch v. Gov't Emps. Ins. Co.</u>, 323 F.R.D. 539, 544 (E.D. Va. 2018) (emphasis added). The analysis of each requirement must be "rigorous," <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350-51 (2011), and Plaintiffs bear the burden to demonstrate that all of the Rule 23 requirements have been satisfied. <u>Branch</u>, 323 F.R.D. at 545.

"Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class." <u>Soutter v. Equifax Info. Servs.</u>, 307 F.R.D. 183, 195 (E.D. Va. 2015) (quotations omitted) (citing <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 155 (1982)). Class certification is appropriate when "the numerosity, commonality, typicality, representativeness, predominance, and superiority requirements of both Rule 23(a) and (b)(3) are met." <u>Lienhart v. Dryvit Sys.</u>, 255 F.3d 138, 146 (4th Cir. 2001). Rule 23 also contains an implicit threshold "ascertainability" requirement. <u>See</u> <u>EQT Prod. Co. v. Adair</u>, 764 F.3d 347, 358 (4th Cir. 2014).

13

## A. Legal Framework for Rule 23(a)

Under Rule 23(a), class certification is appropriate if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). A review of the record discloses that the proposed class meets each of these elements. Defendants do not appear to suggest otherwise. Nonetheless, it is appropriate to confirm that to be the case. So each Rule 23(a) factor will be reviewed briefly.

## 1. Numerosity

Rule 23(a)(1) requires the Court to find that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Whether joinder is impracticable is a fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case. Soutter, 307 F.R.D. at 199. "'Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.'" Id. (quoting Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. 2000)).

14

The putative class is estimated to be between 800 and 1,200 individuals. ECF No. 66 at 19. Exhibit 8 contains a list of 857 individuals identified at least by their name, employee number, job title, hire date, and termination date. See Ex. 8, ECF No. 66-8. This surpasses the threshold necessary for the numerosity requirement, and GDIT has not offered any arguments to the contrary. The numerosity requirement has been established.

## 2. Commonality

The second element of Rule 23(a) is commonality. The Court must find that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To meet this burden, "plaintiffs must present a common contention capable of being proven or disproven in 'one stroke.'" Brown v. Nucor Corp., 785 F.3d 895, 909 (4th Cir. 2015) (internal citation omitted). The primary concern is not just the presence of common questions, but whether "a classwide proceeding [can] generate common answers apt to drive the resolution of the litigation." Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009).

Plaintiffs have shown that "the driving factual and legal questions stem from a common core of facts regarding Defendant's actions and are provable through common evidence," which includes but is not limited to questions such as:

- Whether Defendant terminated the employment of the class members without cause.

- Whether the class members' single site of employment was the Falls Church office.

- Whether Defendant terminated the class members without giving them at least 60 days prior written notice as required by the WARN Act.

- Whether Defendant has any valid defenses justifying less than 60 days' notice.

- Whether Defendant failed to pay the class members 60 days' wages and benefits.

See ECF No. 66 at 19-21.

In this case, the putative class satisfies the commonality requirement, which is related to, but far less demanding than, the predominance requirement of Fed. R. Civ. P. 23(b). Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 624 (1997). Common factual and legal questions pervade the putative class, as listed above, nearly all of which are capable of being "proven or disproven in one stroke." Nucor Corp., 785 F.3d at 909. GDIT has not argued to the contrary. The commonality factor is satisfied.

## 3. Typicality

The third requirement for certification under Rule 23(a) necessitates a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." Falcon, 457 U.S. at 156 (internal quotation marks omitted). It is not necessary that the claims "be perfectly identical or perfectly aligned," but that the prosecution of the plaintiffs' cases "tend[s] to advance the interest of the absent class members." Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006); see also Branch, 323 F.R.D. at 547 (The representative's claims "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim.")(quoting Deiter, 436 at 466-67).

Plaintiffs explain that the third requirement is met because they allege the same injury as the Putative Class Members: they were all terminated by GDIT as part of the same plant closing or mass layoff. Plaintiffs also argue that they and the Putative Class Members all seek to demonstrate that GDIT was a covered WARN employer; directed a plant closing or mass layoff beginning on or around July 3, 2019; did not offer any of the employees with 60

17

days' notice of their terminations; and did not have any valid defense justifying that failure. ECF No. 66 at 21-22.

Plaintiffs have met their burden of showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The proposed class representatives appear to generally have "the same interest and suffer the same injury as the class members." Deiter, 436 F.3d at 466. Accordingly, the claims of the named Plaintiffs align with the claims of the class. GDIT does not say otherwise. And, the typicality requirement is satisfied.

**4. Adequacy of Representation**

The final prerequisite of Rule 23(a) is adequacy: Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry involves an assessment of both the class representative as well as class counsel. Wal-Mart Stores, Inc., 564 U.S. at 350 n.5 (noting that although the final three requirements do "tend to merge," the adequacy requirement also "raises concerns about the competency of class counsel and conflicts of interest."). The requirement is satisfied "when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." Brown

18

v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016)
(internal quotation marks omitted).

The representativeness requirement is satisfied for both the
proposed Class Representatives and proposed Class Counsel because:
(1) there are no conflicts of interest as both Plaintiffs and
proposed class must establish that they were entitled to and not
provided adequate WARN notice; (2) Plaintiffs "have been diligent
in prosecuting the case"; and (3) Plaintiffs' counsel are
"qualified, experienced and generally able to conduct the proposed
litigation." ECF No. 66 at 22 (quoting Eisen v. Carlisle &
Jacquelin, 391 F.2d 555, 562 (2nd Cir. 1968), cert. denied, 417
U.S. 156 (1974)) (internal quotation marks omitted). Plaintiffs'
counsel, Raisner Roupinian LLP, only represents employees affected
by mass layoffs and shutdowns and therefore appropriate for this
action. GDIT does not question Plaintiffs' choice of legal
representation nor class representatives. The adequacy component
of Rule 23(a) has also been met.

## B. Legal Framework for Rule 23(b)(3)

In a motion for certification under Rule (23)(b)(3), the
plaintiff faces the additional burden of demonstrating that
"questions of law or fact common to class members predominate over
any questions affecting only individual members; and that a class
action is superior to other available methods of fairly and
efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3) (emphasis added). In the Fourth Circuit, it is also necessary to demonstrate compliance with a third "implicit" requirement: the proposed class must be readily ascertainable "in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. Each of these three requirements—predominance, superiority, and ascertainability—must be met before certification can be granted.

The Rule 23(b)(3) analysis may overlap with the merits of the underlying case, but "[t]hat cannot be helped." Branch, 323 F.R.D. at 545 (quoting Wal-Mart Stores, Inc., 564 U.S. at 350-51). However, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" Branch, 323 F.R.D. at 545 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

GDIT does not dispute the superiority or ascertainability facets of the Rule 23(b) analysis and argues against class certification only on the lack of predominance. And, an independent assessment by the Court confirms that both of those facets are satisfied.[2]

---

[2]    See supra Parts II.B.2 and 3, pp. 34-37.

## 1. Predominance

Although similar to Rule 23(a)'s requirement of commonality, the predominance criterion of Rule 23(b)(3) is "far more demanding." Amchem Prod., Inc., 521 U.S. at 624; see also Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."). The more challenging standard is a function of the more "adventuresome" nature of Rule 23(b)(3), which "allows class certification in a much wider set of circumstances but with greater procedural protections." Wal-Mart Stores, Inc., 564 U.S. at 362.

Under Rule 23(b)(3), it is not enough merely to demonstrate that common questions exist across the class. Instead, Plaintiffs must demonstrate that those common "questions of law or fact . . . predominate over any questions affecting only individual members." EQT Prod. Co., 764 F.3d at 366. Accordingly, "[t]he predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." Id. This inquiry further turns on whether "the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones." Id. at 367.

Predominance may not be fulfilled by relying on "the legal or factual questions that qualify each class member's case as a genuine controversy." Amchem Prod., Inc., 521 U.S. at 622. In other

words, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. at 23. This concept renders the predominance inquiry fundamentally qualitative: The Court must examine the relationship between the common questions and the individual questions in the context of the case as a whole. See Krakauer v. Dish Network, LLC, 925 F.3d 643, 658 (4th Cir. 2019); Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 429 (4th Cir. 2003).

However, "common issues of liability may still predominate even when some individualized inquiry is required." Ealy v. Pinkerton Gov't Servs., 514 F. App'x 299, 305 (4th Cir. 2013). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (internal citation omitted). So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved. Krakauer, 925 F.3d at 658; Ealy, 514 Fed. App'x at 305. Accordingly, it is necessary to review whether class-based questions may undermine or support class cohesion, such as whether the class members experienced the same wrongdoing during the same

22

timeframe and by the same means. See Amchem Prod., Inc., 521 U.S. at 624 (discussing the predominance factors relied upon by the Court in Georgine v. Amchem Prod., Inc., 83 F.3d 610, 626 (3rd Cir. 1996)).

**(a) Parties' Arguments**

Here, the parties dispute whether Plaintiffs and Putative Class Members are entitled to recovery under the WARN Act, the resolution of which turns on the proposed class's "single site of employment" and the factual allegations supporting each party's statutory interpretation. Specifically, the parties dispute whether the proposed class's "single site of employment" for WARN Act purposes was the Falls Church, Virginia office where the PMO was housed and from which GDIT's mobile workforce was directed.

Because the WARN Act does not define "single site of employment," resolution of this keen question necessitates consideration of DOL's "single site of employment" regulations known as Subpart 6.[3] See generally 20 C.F.R. § 639.3(6). "These

---

[3]    Plaintiffs alternatively argue that, if Subpart 6 does not apply, the employees' single site will depend on whether GDIT's mobile workforce was a "truly unusual organizational situation" within the meaning of Subpart 8 of the DOL regulations. 20 C.F.R. § 639.3(i)(8). This determination, according to Plaintiffs, depends on reviewing the organizational structure. ECF No. 66 at 27. GDIT asserts that, although this argument is untimely, it does not alter the predominance analysis. GDIT further avers that Plaintiffs have not pled facts suggesting that Subpart 8 applies nor engaged in discovery that would support this contention. See ECF No. 72 at 35-36. GDIT is correct. Subpart 8 has not been sufficiently addressed in the pleadings, has not been addressed in

regulations are entitled to 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" Meson, 507 F.3d at 808-809 (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)). Subpart 6, as previously replicated above, states:

> For workers whose primary duties require <u>travel from point to point</u>, who are outstationed, or whose <u>primary duties involve work outside any of the employer's regular employment sites</u> (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their <u>home base</u>, from which their work is the assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6) (emphasis added).

Both parties agree that whether Subpart 6's characterization of "single site of employment" applies to Plaintiffs and Putative Class Members is governed by the Fourth Circuit's decision in Meson. There, the Fourth Circuit held that Subpart 6 applies to "truly mobile workers, without a regular, fixed place of work." Meson, 507 F.3d at 809.

In Meson, a former employee, whose employment had ended when the employer's assets were sold, sued the employer and its parent company alleging a violation of the WARN Act for untimely notice, among other things. The employee attempted to assert that the

---

discovery, and was first presented in the PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 66). For these reasons, Subpart 8 will not be considered at this stage.

company's headquarters was her single employment site. The Fourth Circuit determined that the employee's company office in Virginia, rather than the company's headquarters in Florida, was the plaintiff's "undisputed fixed place of work" and, therefore, her WARN single site. Id. at 810. The Court of Appeals found that the corporate headquarters could not be used as the single site of employment for the plaintiff-employee because it would lead to "a potentially limitless scope" in which "every such regional manager or chief executive could claim the corporate headquarters—in lieu of the office she manages—as her 'single site of employment'." Id. Accordingly, the Fourth Circuit held that the WARN Act did not apply to the employee because she was not a "mobile worker". Id. at 811.

To decipher whether the plaintiff-employee was a mobile worker within the context of Subpart 6, the Court analyzed her office location and job duties. Although the plaintiff-employee traveled to client sites as well as received assignments from and reported into the Florida headquarters, the dispositive fact was that she was assigned to a specific office in Virginia where she managed two employees.[4]

---

[4]    The Court of Appeals also indicated that more than a "minimal impact" to the community and its economy would be necessary to warrant application of the WARN Act (i.e., at least greater than three employees in the area). Id. at 811.

In reaching that conclusion, the Court of Appeals explained that the language in Subpart 6 "connote[s] the absence of a fixed workplace" and that "home base" has been construed as "a site that the employee visits during the course of a typical business trip". Id. at 809 (quoting Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 146 (3rd Cir. 1998)) (internal quotation marks omitted). Moreover, the decision in Meson considered it important that the Subpart's language, specifically "[t]he terms 'travel . . . from point to point,' 'outstationed,' and 'home base,' all connote[d] the absence of a fixed workplace." Id. That text combined with examples from the regulatory commentary, led to the conclusion that Congress intended Subpart 6 to apply to employees with no fixed worksite, such as bus drivers and railroad workers, whose "jobs are characterized by travel and mobility." Id. (quoting Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042, 16051 (Apr. 20, 1989)).

In the present case, Plaintiffs claim that Subpart 6 entitles them to WARN Act coverage because GDIT's Falls Church office, and not their home offices, is their "single site of employment." Plaintiffs assert that common evidence will demonstrate that "the primary duties of all proposed class members 'involve[d] work outside any of the employer's regular employment sites,' . . . and that their homes were not a 'fixed office' under Meson." ECF No. 66 at 25 (internal citation omitted). This common evidence in the

26

record includes: GDIT's Technical Proposal and Excerpt of Price Proposal (Ex. 6, ECF No. 66-6); GDIT's "Flexible Work Location" policy (Ex. 25, ECF No. 66-18); the Protection of Personally Identifiable Information ("PII") policy (Ex. 26, ECF No. 66-19); Operations Position Descriptions (Ex. 11, ECF No. 66-11); Organizational Chart Review (Ex. 10, ECF No. 66-10); and Excerpt from Labor Hours Report (Ex. 28, ECF No. 66-20). These policies, according to Plaintiffs, were uniformly applied to the Putative Class Members and will establish that GDIT enabled employees to work outside of the home.

In particular, the Flexible Work Location Policy states that "employees may work some or all of the workweek in a company-provided office setting, co-located with customers, or from an alternative location (generally the employee's home)." Ex. 25, ECF No. 66-18 (emphasis added). The policy applies to all GDIT's organizational units and defines two different types of home-based employees: those who work from home at least three days a week ("Home-based Worker") and those who work from a GDIT office at least three days a week ("Home Flex Worker"). Id. at 3. The PII Policy requires employees working on the OPM contract to securely store and retain private information pertinent to investigations regardless of workplace location. See Ex. 26, ECF No. 66-19. Taken together, Plaintiffs assert that these policies describe the job duties of the potential class members, which demonstrates that

27

"their homes were not a fixed office under Meson." ECF No. 66 at 32 (internal quotation marks omitted).

Plaintiffs also add that "the primary duties" of putative class employees included traveling from "point to point" for interviews and reviews. Id. at 33. This, according to Plaintiffs, substantiates that "the primacy of mobility" that GDIT's contract with OPM required so as to allow for the efficient completion of investigations. Id. Other evidence in the record, including Labor Hour Reports, travel expense records, daily manifest check-ins and check-outs, check ride forms, and daily task records from the CMS[5] are probative of how travel was a primary, indeed essential, part of the employees' jobs. Id. at 34. Finally, Plaintiffs point out that common evidence in the form of Workday records[6] and PMO management activities demonstrates that employees reported to and received assignments from the PMO office in Falls Church, which they believe is consistent with Subpart 6. ECF No. 66 at 34; 20

---

[5]   GDIT tracked case progress in the CMS. CMS captured Investigators' daily work, including tasks performed (e.g., interview, record review), source units transmitted, timeliness, quality deficiencies (as noted by Case Reviewers), and incidents of misplaced PII. ECF No. 66-6 at 10.

[6]   "The listed information (job classification, manager, hire/termination date, purported WARN notice date, and designated work location) was stored in GDIT's 'Workday' HR database, which also contained performance review information, team and line management, leave time, and related information." Shartle 30b6 Dep., 28:23-29:3, 29:20-30:2, Ex. 1, ECF No. 66-1.

C.F.R. 639.3(i)(6) (the single site location includes the facility "from which their work is assigned" and "to which they report").

Plaintiffs argue that the legal issues will have class-wide application and the factual evidence will be assessed through common evidence without the need for individualized assessments. ECF No. 66 at 28. Therefore, Plaintiffs assert that their WARN claim provides common elements among the proposed class that are "class-wide proof" because the Court will have to assess whether Plaintiffs and Putative Class Members engaged in "primary duties [that] require travel from point to point" or "involve work outside any of the employer's regular employment sites." Id. at 25 (referencing 20 C.F.R. § 639.3(i)(6)).

In response, GDIT asks the Court to contemplate the merits of Plaintiffs' argument to decide "whether the Rule 23 prerequisite for class certification are satisfied." ECF No. 72 at 18 (quoting EQT Prod. Co., 764 F.3d at 357). GDIT agrees that the meaningful issue in dispute is "whether the Falls Church Office constitutes the single site of employment for the putative class members," but GDIT takes the view that Plaintiffs cannot prove that point without "individualized mini-trials." Id. at 26.

Because the employees worked from home offices across the country and abided by varying travel requirements, GDIT asserts that "true mobility" within the confines of Subpart 6 cannot be demonstrated on a class-wide basis because: (1) the Meson test "is

holistic and circumstance-dependent"; (2) the common evidence provided by Plaintiffs is insufficient to demonstrate "true mobility"; (3) Meson demands individualized proof; and, (4) certification would deprive GDIT of its right to litigate its Meson-based defense against individual Putative Class Members. See ECF No. 72 at 22-27.

GDIT's view about the lack of predominance relies on the Fourth Circuit's holding in Meson, which requires the Court to construe Subpart 6 narrowly because the Subpart "was intended to apply only to truly mobile workers without a regular, fixed place of work." 507 F.3d at 809. Thus, according to GDIT, Meson necessitates that the Court must assess whether "class members qualified as 'truly mobile workers' . . . such that Subpart 6 could even *potentially* apply." ECF No. 72 at 26 (emphasis added). Further, GDIT argues that, "even if Subpart 6 potentially applied, the Court would still need to assess individuals' single sites of employment using the disjunctive guidelines of that provision, a fact-intensive exercise that would involve pinpointing where class members 'reported' or were 'assigned' work, in a context where most or all of their supervisors and assigners were based in home offices." Id. And, GDIT takes the view that under Meson, job duties necessitating even "significant travel" are legally inadequate to apply to Subpart 6. Id. at 28 (quoting Meson, 507 F.3d at 804, 809-11).

Both parties agree that, in order to claim Falls Church, Virginia, the location of the PMO, as their WARN single site of employment, Putative Class Members must show that their job duties meet the standard set forth in Subpart 6. However, the parties differ on how <u>Meson</u> should be applied to the Putative Class Members in light of the Subpart 6 requirements. <u>Compare</u> ECF No. 72 at 28-29 <u>with</u> ECF No. 75 at 14-15. Plaintiffs argue that the Subpart 6 applies under <u>Meson</u> because "all [putative] class members' work was to be performed outside any of [GDIT's] regular employment sites" and their "primary duties required them [to] travel point to point (in the case of Investigators and Supervisors)."[7] GDIT argues that <u>Meson's</u> definition of "truly mobile workers" precludes the application of Subpart 6 to the Putative Class Members because employees with travel responsibilities who maintain a "regular fixed place of work" (e.g., the employees' home offices) cannot be deemed "truly mobile" under the Fourth Circuit's test. ECF No. 72 at 28-29.

---

[7]   PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 75 at 15) (referring to 20 C.F.R. § 639.3(i)(6)).

**(b) Analysis**

First, as a threshold issue, courts within the Fourth Circuit have generally certified Rule 23 WARN class actions, rejecting objections based on predominance where, as here, there are few and insignificant individual issues. See e.g., Gautier v. Tams Mgmt., Inc., No. 5:20-cv-00165, 2021 WL 4429611, at *5 (S.D. W.Va. Sep. 27, 2021) (granting motion to certify and finding that "[r]especting predomination, any individual questions are minor and substantially outweighed by the common questions regarding whether a WARN Act violation occurred."); McKenzie v. CDA, Inc., No. 3:19-cv-213, 2021 WL 1220620 (W.D.N.C. Mar. 31, 2021) ("Plaintiff has shown that he and the prospective class members desire to prove predominantly the same facts against the Defendant without presenting any conflicts of interest against one another."); Droste v. Vert Cap. Corp., No. 3:14-cv-467, 2015 WL 1526432 (E.D. Va. Apr. 2, 2015) (granting class certification for manufacturing plant employees); Nolan v. Reliant Equity Invs., LLC, No. 3:08-CV-62, 2009 WL 2461008 (N.D. W. Va. Aug. 10, 2009) (granting class certification for employees in three separate facilities); Washington v. Aircap Inds. Corp., 831 F. Supp. 1292 (D.S.C. 1993) (granting class certification for seasonal employees). Courts may contemplate whether a "single site of employment" should be deemed where a business is headquartered and operated out of, even when employees travel across the county and

32

service various contracts at different client sites. Schmidt v. FCI Enters. LLC, No. 1:18-cv-01472, 2019 WL 5748952 (E.D. Va. Nov. 5, 2019), rev'd Schmidt v. FCI Enters. LLC, 3 F.4d 95, 104 n.7 (4th Cir. 2021) (reversing because employer at issue was not an employer covered by the WARN Act and declining to address whether defendant's headquarters were properly construed as the single site of employment).

Second, the facts of Meson differ significantly from those presented here. In Meson, the plaintiff was a regional sales manager who oversaw two employees located in a Virginia office. Accordingly, Meson identifies two types of employees: (1) those "characterized" by mobility, including "traveling salespersons who work primarily out of their homes or cars" and (2) the Meson plaintiff who "worked out of a fixed office" and "managed the two other employees in that office." 507 F.3d at 809. To analyze whether Subpart 6 applied, the Meson Court relied on the plaintiff's job duties to determine that she was more like a regional sales manager rather than a traveling salesperson despite being required to occasionally travel to various client sites. Id. at 810. Thus, her single employment site was anchored by her position's responsibilities (i.e., managing two employees in the Virginia office where she worked regularly worked). Id.

Here, the employees at issue are not required to work at, or to supervise others at, a particular GDIT site. The GDIT policies

in the record provide flexibility as to where the employees worked, and those policies apply to the class equally without the need for an individualized inquiry. See e.g., Technical Proposal and Excerpt of Price Proposal, Ex. 6, ECF No. 66-6. For the entire class identified by GDIT as its "mobile workforce," GDIT's policies governing where employees may work appear to have been applied uniformly and may establish "whether those policies created 'place of employment[.]'" ECF No. 75 at 11. These policies will be assessed to determine the place of employment on a class-wide basis. For the "travel subclass", the following evidence tends to indicate that travel was a primary job duty: CSRA OPM Field Work Services (Ex. 6, ECF No. 66-6 at 28, 31, 82), Excerpt from Labor Hours Report (Ex. 28, ECF No. 66-20) (listing investigator travel), Beecroft Travel Expenses (Ex. 29, ECF No. 66-21), and Merino Travel Expenses (Ex. 30, ECF No. 66-22). Accordingly, there appears to be evidence that GDIT's conduct was substantially the same with respect to all Putative Class Members.

The Court declines to engage in a full merits-based analysis of whether Plaintiffs can prove a "single site of employment" at this stage in the litigation, particularly because Meson was not a decision respecting whether class certification was appropriate. GDIT's argument that, in this case, an individualized inquiry will be necessary for each Putative Class Member does not properly contemplate whether there is a "single site of employment" that

serves as a common question addressable through common evidence. And, the issue should be litigated on its merits, rather than leveraged as a tool to deny class certification at this stage in the proceedings. Amgen, 568 U.S. at 467. Class certification remains appropriate because it "provides a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications" driven by "the fact that the class action is binding on all class members." Gunnells, 348 F.3d at 427 (internal quotation marks omitted).

Also, at this stage, the record strongly shows that what GDIT called its "mobile workforce" was essential both to OPM's decision to award the contract to CSRA, GDIT's predecessor, and to the efficient performance of the OPM contract. And, the record also provides strong support for the Plaintiffs' position that the mobile workforce was directed from the PMO and that the PMO distributed the work-product of the mobile workforce to the OPM.

Further, "there is no risk whatsoever that a failure of proof on the common question of [single site of employment] will result in individual questions predominating." Amgen, 568 U.S. at 468. If Plaintiffs cannot prove a single site of employment, the litigation must end, and "thus will never cause individual question of reliance or anything else to overwhelm questions common to the class." Id. GDIT, therefore, will not be deprived of its right to

litigate a <u>Meson</u>-based defense against the class as a whole (i.e., whether the former employees were tied to the PMO Office or not as their home base), rather than individual class members.

The elements of Plaintiffs' WARN Act claim can be resolved largely on a class-wide basis. The two primary issues include: (1) whether GDIT's PMO office in Falls Church, Virginia constitutes a site of employment for the OPM contract employees, and (2) whether GDIT failed to provide notice under the WARN Act. Both inquiries impact the Putative Class Members without the need for individualized explorations. They also go to the core of the WARN Act claim and predominate over any individualized issues. Therefore, the predominance requirement has been fulfilled because "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." <u>Amgen</u>, 568 U.S. at 459.

Granting class certification will still allow the parties to dispute whether Plaintiffs can meet the "single site of employment" under Subpart 6 and <u>Meson</u>, particularly because "the Fourth Circuit has not provided specific guidance regarding which standard a district court should use to evaluate single employer status under the WARN Act." <u>Butler v. Fluor Corp.</u>, 511 F. Supp. 3d 688, 698 (D.S.C. 2021). Accordingly, the contention that Plaintiffs cannot prove a WARN Act claim due to lack of a "single site of employment" "is properly addressed at trial or in a ruling on a summary

36

judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Amgen, 568 U.S. at 470.

## 2. Superiority

The superiority requirement of Rule 23(b)(3) requires the Court to find "that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Along with predominance, the superiority requirement seeks "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prod., Inc., 521 U.S. at 615. A "strong presumption in favor of a finding of superiority" arises where "the alternative to a class action" is "no action at all." Soutter, 307 F.R.D. at 218 (internal citation omitted). After considering each of the criteria set out by Rule 23(b)(3)(A)-(D), the Court finds that adjudication on a class-wide basis is superior to individual litigation.

Plaintiffs assert that "the [small] size of the employees' respective claims makes individual suits not only inferior, but unfeasible." ECF No. 66 at 35. On that score, Plaintiffs have shown that each class members' claim is less than $10,000, not including benefits, and that therefore, they cannot retain counsel to pursue

these claims as individual litigants. Id. at 14, 28. GDIT has not addressed that point.

The WARN Act limits damages and disincentivizes individual claims because of the potential for a small recovery even if there is merit to the claims. Here, it is evident that damages per Putative Class Member are small and unlikely to be litigated on an individual basis. Thus, the Court finds that Plaintiffs and Putative Class Members' interests in individually directing the prosecution of separate actions is negligible. "Concentrating any WARN litigation in a single class action will avoid multiple suits and will maximize judicial economy, efficiency, and uniformity of outcomes for similarly situated individuals." Applegate v. Formed Fiber Techs., LLC, 2:10-cv-00473, 2012 WL 3065542, at *9 (D. Me. Jul. 27, 2012). Further, the Court has not detected any difficult issues in managing the class action, as proposed. Whether GDIT neglected to give the requisite notice under the WARN ACT is particularly well-suited for class action procedure: the class members have already been identified through discovery, the potential liability of GDIT can be calculated, and only GDIT's conduct must be examined and adjudicated. See id. Finally, when a class is certified, GDIT may still pursue dispositive motions, including whether there is a single site of employment, against the class without need for individual litigation.

**3. Ascertainability**

In the Fourth Circuit, "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. And, "if class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." Id.

Here, Plaintiffs provide evidence identifying the employees assigned to the OPM contract who were subsequently terminated. See Ex. 22, ECF No. 66-16 at 2-10; Ex. 8, ECF No. 66-8 at 3-11. Exhibit 22 lists the BICS PMO Falls Church Officer Organization Chart for May 31, 2019, which contains names for GDIT staff members and indicating the total on staff as 1,225. See Ex. 22, ECF No. 66-16 at 1. This exhibit does not appear to explicitly convey whether the staff listed were assigned to the OPM contract; however, Exhibit 8 contains a list of 857 individuals identified at least by their name, employee number, job title, hire date, and termination date. See Ex. 8, ECF No. 66-8. Accordingly, the proposed class appears to be ascertainable.

### III. CONCLUSION

For the foregoing reasons, PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND RELATED RELIEF (ECF No. 61) will be granted.

It is so ORDERED.

/s/ _____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: February ___, 2022

40